**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION**

| | | |
|---|---|---|
| **DELAWARE RIVER PORT AUTHORITY,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | Civil Action No. _____ |
| | : | |
| **FRATERNAL ORDER OF POLICE** | : | |
| **PENN-JERSEY LODGE 30,** | : | |
| | : | |
| **Defendant** | : | |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, the Fraternal Order of Police, Penn-Jersey Lodge 30 ("Lodge 30" or "Defendant") hereby removes this action, originally filed in the Superior Court of New Jersey, Chancery Division, Camden County to the United States District Court for the District of New Jersey, Camden Division.

The grounds for removal are as follows:

1).    On February 3, 2016, Plaintiff Delaware River Port Authority ("DRPA" or "Plaintiff") filed its Verified Complaint Seeking to Vacate Arbitration Award in the Superior Court of New Jersey, Chancery Division, Camden County styled as *Delaware River Port Authority v. Fraternal Order of Police Penn-Jersey Lodge 30*. The case was assigned Docket No. C-12-16.

2).    Defendant Lodge 30 was served with the Verified Complaint on February 25, 2016. Accordingly, this Notice is filed within the thirty (30) day time limit established by 28 U.S.C. § 1446(b).

3).     Camden County is within the Camden Division of the United States District Court for the District of New Jersey and therefore, removal to this district and division is proper under 28 U.S.C. § 1441(a).

4).     The DRPA is a "public corporate instrumentality of the Commonwealth of Pennsylvania and the State of New Jersey," *Fraternal Order of Police, Penn-Jersey Lodge 30 v. DRPA ("DRPA III")*, 924 F. Supp. 2d 574, 575 (D.N.J. 2013), but is "not an 'arm' of either state … [n]or is it vested with attributes of state sovereignty." *Id.*

5).     Rather, the DRPA is a creature of a Compact of the Commonwealth of Pennsylvania and the State of New Jersey formed with the consent of the Congress of the United States under the Compact Clause of the United States Constitution, and "the construction of [this] bi-state [C]ompact that has been consented to by Congress pursuant to the Compact Clause presents a federal question." *DRPA III,* 924 F. Supp. 2d at 575, citing *Cuyler v. Adams,* 449 U.S. 433, 438, 101 S. Ct. 703, 66 L.Ed. 2d 641 (1981).

6).     Pursuant to the Compact, the DRPA entered into a Collective Bargaining Agreement ("CBA") with Lodge 30, which represents the patrol officers, corporals and sergeants employed by the DRPA.  The CBA provides for final and binding arbitration of Grievances, which the CBA defines as "any difference between the DRPA and any Employee who has completed his probationary period as to the meaning and application of this Agreement, or the policy and/or procedures affecting the terms and conditions of employment . . . ."  A copy of the CBA is attached to Plaintiff's Verified Complaint as Exhibit "B -1."

7).     On October 10, 2014, during the term of the CBA, Lodge 30 filed a Grievance on behalf of Officer Paul Williams, a non-probationary employee, protesting the DRPA's decision, in

September 2014, to place him out of work after it received an Independent Medical Evaluation ("IME") by one of the DRPA's contracted physicians, Dr. Neil Kahanovitz, while at the same time denying him pay for receiving an injury while on duty, a benefit for which he was arguably entitled to under the terms of the CBA, which provides that any patrol officer who suffers an injury in the line of duty shall receive up to 26 weeks of full pay.

8).   Pursuant to the CBA, the DRPA and the FOP mutually selected Anthony F. Visco, Jr. Esquire to serve as the Arbitrator of this Grievance.  The parties agreed upon a Joint Stipulation of Facts, and filed written briefs to the Arbitrator.

9).   On December 30, 2015, Arbitrator Visco issued his Opinion and Award.  A copy of the Opinion and Award is attached as Exhibit "A" to Plaintiff's Verified Complaint.

10).   In his Opinion and Award, Arbitrator Visco noted that not only did Lodge 30 contend that Officer Williams was improperly denied Injured On Duty under the CBA, but also that the DRPA had "unilaterally re-opened" an earlier Pennsylvania Workers Compensation claim Williams had filed several years before, and "had him paid under the [Workers Compensation] statute at a rate of $782.85 per week, which was based on his salary in 2008-2009," instead of at a rate to reflect his salary as of 2014.  *See* Exhibit "A" to Plaintiff's Verified Complaint, at 10-11.

11).   Arbitrator Visco ruled that Officer Williams was not entitled to Injured on Duty pay, because he had already received his full 26 week allotment of such pay in connection with his earlier claim, which the Arbitrator found was related to his present malady.  However, Arbitrator Visco went on to find  it "totally unreasonable" that the Workers Compensation benefit Williams was forced to take in lieu of salary was based upon his 2008 salary, and held that this benefit "Should be increased based upon the rate of pay in effect" when Williams was forced out of work in September,

2014. *See* Exhibit "A" to Plaintiff's Verified Complaint, at 13.

    12).    To remedy this wrong, Arbitrator Visco "instruct[ed] the parties to cooperate to achieve this goal" of providing Officer Williams with the proper amount of his Workers Compensation benefit, tied to his actual rate of pay earned as of September, 2014. *See* Exhibit "A" to Plaintiff's Verified Complaint, at 14.

    13).    The Arbitrator suggested two ways that the parties could accomplish this: First, they could seek to have "the agency responsible for the WC [Workers Compensation] payments to disabled Authority police officers . . . calculate the basis for compensation" based on "what Grievant Williams was entitled to make on the date of his placement on involuntary leave." *See* Exhibit "A" to Plaintiff's Verified Complaint, at 14.  Second, if the "agency responsible" was either "unable or unwilling to do this," Arbitrator Visco directed the DRPA to "make up the difference between a $782.88 per week WC rate and the amount the above WC formula would produce after taking into consideration the wage rate of September 19, 2014", the date Officer Williams was forced off of active duty. *Id.*  Additionally, Arbitrator Visco opined that it "would not be unreasonable for the DRPA to consider permitting Grievant Williams to work on a regular or part time basis (two or three days per week) or, if necessary, on an intermittent basis ... at the ... current wage rate for police officers holding the same rank as Mr. Williams." *Id.*

    14).    On or about January 26, 2016, Counsel for Lodge 30 wrote to DRPA's attorney, in the spirit of the Arbitrator's "instruction" that the parties "cooperate to achieve th[e] goal" of according Officer Williams with his proper amount of Workers Compensation, asking that the parties discuss ways of implementing the Award.

15).    Instead of substantively replying to this overture, the DRPA filed its Verified Complaint to Vacate the Arbitrator's Award in New Jersey state court, arguing that it was "unable to comply with the portion of the Arbitrator's Award" mandating that Officer Williams receive the correct amount of Workers Compensation, and that it could not "be ordered to adjust Williams Workers Compensation benefits" in the manner the Arbitrator proscribed in his Opinion and Award.

16).    "The DRPA's powers and duties are framed entirely by the Compact." *DRPA III,* 924 F. Supp. 2d at 575.  Because the DRPA's Verified Complaint contends that, under the Agreement – formed pursuant to the Congressionally approved Compact – it is "unable to comply with the Award," this matter presents a federal question, and the district court has original jurisdiction pursuant to 28 U.S.C. § 1331.  It is well-established that removal is proper "when a federal question is presented on the face of the plaintiff's well-pleaded complaint." *Hirschbach v. NVE Bank,* 496 F. Supp. 2d 451, 454 (D.N.J. 2007).

17).    Accordingly, this action may be removed to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.  No responsive pleadings or motions have been filed in this matter prior to this Notice of Removal, and no orders have yet been signed by the state court.  Pursuant to 28 U.S.C. § 1446 and Civ. Rule 5.1 of the Local Rules of this Court, a copy of the executed process and pleadings in the state court proceeding served upon Lodge 30 is attached to this Notice.

**Respectfully submitted,**

**SPEAR WILDERMAN, P.C.**

BY:    _____

**CHARLES T. JOYCE**
**Attorney for FOP Penn-Jersey Lodge 30**

Dated: March 7, 2016

-5-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN DIVISION**

|  |  |  |
|---|---|---|
| **DELAWARE RIVER PORT AUTHORITY,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Civil Action No. _____** |
| | : | |
| **FRATERNAL ORDER OF POLICE** | : | |
| **PENN-JERSEY LODGE 30,** | : | |
| | : | |
| **Defendant** | : | |

## CERTIFICATION OF SERVICE

I, Charles T. Joyce, Esquire, counsel for Defendant, FOP Penn-Jersey Lodge 30, hereby

certify that a true and correct copy of the foregoing Notice of Removal has been served on the

following this 7th day of March in the manner so indicated:

> Superior Court of New Jersey
> Chancery Division, General Equity
> Camden County Hall of Justice, First Floor
> 101 S. 5th Street
> Camden, New Jersey 08103
> **Hand Delivery**
>
> William F. Cook, Esquire
> Brown & Connery LLP
> 360 Haddon Avenue
> P.O. Box 539
> Westmont, New Jersey 08108
> wcook@brownconnery.com
> **First Class Mail and Electronic Mail**

SPEAR WILDERMAN, P.C.

BY: _____
CHARLES T. JOYCE

# BROWN & CONNERY, LLP

ATTORNEYS AT LAW
360 HADDON AVENUE
WESTMONT, NEW JERSEY 08108
(856) 854-8900
FAX (856) 858-4967

William F. Cook, Esq.
wcook@brownconnery.com

February 3, 2016

**VIA HAND DELIVERY**

**Clerk**
Superior Court of New Jersey, Chancery Division, General Equity Part
101 South 5th Street
Camden, New Jersey 08103

Re:   **Delaware River Port Authority v. FOP Penn-Jersey Lodge 30**
Superior Court Docket No. –
Our File No. 15-0019

Dear Sir or Madam:

We represent defendant Delaware River Port Authority in this matter. Enclosed for filing are the following items

1. Verified Complaint Seeking to Vacate Arbitration Award with Exhibits; and
2. Verification of Raymond J. Santarelli.

Pursuant to R. 4:5-1(b)(1), no Case Information Statement is required for non-foreclosure General Equity actions.

Please note that the DRPA does not seek temporary or interlocutory injunctive relief, and therefore, no Order to Show Cause is submitted in accordance with R. 4:52-1. Kindly stamp and return the above items, after which the DRPA will serve them on the FOP in accordance with R. 4:4-4.

It is anticipated that the FOP will file an Answer, after which the parties will agree to a briefing schedule for summary judgment. The issues in this matter are purely legal, and therefore, no factual discovery will be required.

Please charge our account number 10300 (reference number 150019000) for any applicable filing fees.

2582865.v1

BROWN & CONNERY, LLP

February 3, 2016
Page 2

Please stamp a copy of these items "FILED" and return to our waiting courier.

Thank you.

Respectfully submitted,

BROWN & CONNERY, LLP



William F. Cook, Esquire

WFC/
Enclosures

2582865.v1

## SUMMONS

| | |
|---|---|
| Attorney(s) | William F. Cook |
| Office Address | Brown & Connery LLP |
| | 360 Haddon Avenue |
| Town, State, Zip Code | Westmont, NJ 08108 |
| Telephone Number | (856) 854-8900 |
| Attorney(s) for Plaintiff | Delaware River Port Authority |

**Superior Court of New Jersey**

Camden     COUNTY

Chancery Division     DIVISION

Docket No:   C-12-16

Delaware River Port Authority

     Plaintiff(s)

    Vs.

FOP Penn-Jersey Lodge 30

     Defendant(s)

## CIVIL ACTION
## SUMMONS

**From The State of New Jersey To The Defendant(s) Named Above:**

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/s/ _____
Clerk of the Superior Court

DATED:    02/25/2016

Name of Defendant to Be Served:    Fraternal Order of Police Penn-Jersey Lodge 30

Address of Defendant to Be Served:    c/o Spear Wilderman PC, 230 S. Broad Street, Philadelphia, PA 19102

Revised 11/17/2014, CN 10792-English (Appendix XII-A)



FEB - 3 2016

CAMDEN COUNTY SUPERIOR COURT

C 12-16

**BROWN & CONNERY, LLP**
William F. Cook, Esquire (012122003)
360 Haddon Avenue
Westmont, New Jersey 08108
(856) 854-8900
*Attorneys for Plaintiff Delaware River Port Authority*

| | |
|---|---|
| **DELAWARE RIVER PORT AUTHORITY,** | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION GENERAL EQUITY PART CAMDEN COUNTY |
| **Plaintiff,** | DOCKET NO. C 12-16 |
| **v.** | Civil Action |
| **FRATERNAL ORDER OF POLICE PENN-JERSEY LODGE NO. 30 IN THE MATTER OF PAUL WILLIAMS** | **VERIFIED COMPLAINT SEEKING TO VACATE ARBITRATION AWARD** |

Plaintiff, the Delaware River Port Authority ("DRPA," "Authority," or "Plaintiff"), by way of Verified Complaint against defendant Fraternal Order of Police, Lodge No. 30, ("the Union," "the FOP" or "Defendant") hereby states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff DRPA is a bi-state agency created by Congress in 1932 which owns, operates, and secures various transportation facilities associated with the Delaware River.[1]   The DRPA's facilities include the Benjamin Franklin Bridge, the Walt Whitman Bridge, the Commodore Barry Bridge, the Betsy Ross Bridge, and the Port Authority

---

[1] The governing document of the DRPA is the DRPA Compact. *See* Pub. Res. 26, ch. 258, 47 Stat. 308 (1932).   Both Pennsylvania and New Jersey have statutorily acknowledged their participation in the DRPA.  *See* Pa. Stat. Ann. tit. 36, §§ 3503 to 3509; N.J.S.A. 32:3-1 to -18.

2581303.v1

BROWN & CONNERY, LLP
William F. Cook, Esquire (012122003)
360 Haddon Avenue
Westmont, New Jersey 08108
(856) 854-8900
*Attorneys for Plaintiff Delaware River Port Authority*

| | |
|---|---|
| **DELAWARE RIVER PORT AUTHORITY,**<br><br>           **Plaintiff,**<br><br>v.<br><br>**FRATERNAL ORDER OF POLICE PENN-JERSEY LODGE NO. 30 IN THE MATTER OF PAUL WILLIAMS** | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION GENERAL EQUITY PART CAMDEN COUNTY<br><br>DOCKET NO.<br><br>           Civil Action<br><br>**VERIFIED COMPLAINT SEEKING TO VACATE ARBITRATION AWARD** |

Plaintiff, the Delaware River Port Authority ("DRPA," "Authority," or "Plaintiff"), by way of Verified Complaint against defendant Fraternal Order of Police, Lodge No. 30, ("the Union," "the FOP" or "Defendant") hereby states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff DRPA is a bi-state agency created by Congress in 1932 which owns, operates, and secures various transportation facilities associated with the Delaware River.[1] The DRPA's facilities include the Benjamin Franklin Bridge, the Walt Whitman Bridge, the Commodore Barry Bridge, the Betsy Ross Bridge, and the Port Authority

---

[1] The governing document of the DRPA is the DRPA Compact. See Pub. Res. 26, ch. 258, 47 Stat. 308 (1932). Both Pennsylvania and New Jersey have statutorily acknowledged their participation in the DRPA. See Pa. Stat. Ann. tit. 36, §§ 3503 to 3509; N.J.S.A. 32:3-1 to -18.

2581303.v1

Transit Corporation ("PATCO") high-speed line.  The DRBA is headquartered at One Port Center, 2 Riverside Drive, Camden, New Jersey.

2.      Defendant Fraternal Order of Police Penn-Jersey Lodge 30 ("FOP" or "Defendant") is an unincorporated labor organization with a business mailing address of P.O. Box 1466, Bellmawr, New Jersey 08099.  The FOP represents DRPA patrol officers, corporals, and sergeants.

3.      The DRPA and FOP are parties to a Collective Bargaining Agreement which expired on December 31, 2009.  The DRPA and FOP are also parties to a recently-executed Collective Bargaining Agreement for the time frame of January 1, 2010 to December 31, 2017.

4.      As explained below, the parties engaged in a labor arbitration before the American Arbitration Association under AAA Docket No. 01-15-0002-4261 with respect to a grievance brought by a DRPA police officer, Paul Williams.  A decision was rendered in that matter on December 30, 2015 (Exhibit A).  The decision was electronically mailed to the parties on January 4, 2016.

5.      N.J.S.A. 2A:24-7 provides that "A party to the arbitration may, within 3 months after the award is delivered to him, unless the parties shall extend the time in writing, commence a summary action in the court aforesaid for the confirmation of the award or for its vacation, modification or correction."

6.      Under R. 4:3-2(a)(2), "Venue shall be laid by the plaintiff in Superior Court actions as follows: . . . actions not affecting real property which are brought by or against municipal corporations . . ., in the county in which the cause of action arose[.]"

BROWN & CONNERY, LLP
Westmont, NJ 08108

2581303.v1

2

Venue is proper in Camden County, as the parties are both located in Camden County, and the Collective Bargaining Agreements which underlie the grievance procedure are located in Camden County.

## FACTS

**I.**   **The Underlying Incident Giving Rise to the Grievance and the Record Before the Arbitrator**

7.     This matter concerns a grievance filed on October 9, 2014 by the FOP on behalf of Officer Paul Williams.  For purposes of the underlying arbitration, the parties agreed to the stipulations attached as Exhibit B ("Joint Stipulations").  The parties further agreed to the joint submission of the exhibits attached to such stipulations (Exhibits J-1 to J-9).  Based on the Stipulations and Joint Exhibits, the record was submitted to AAA Arbitrator Anthony Visco, along with closing briefs.  As noted, Arbitrator Visco's Award was submitted to the parties on January 4, 2016.

8.     The grievance is brought under Article XXXI of the Collective Bargaining Agreement, which states:

### ARTICLE XXXI

### INJURED-ON-DUTY PAY

**Section 1.**     For purposes of this contract term, paragraph 3 of the Arbitration Award of September 22, 2008 is hereby incorporated.  As set forth therein, any Employee injured while engaged in police activities and within the scope of his/her job assignment and applicable Work Rules, shall receive, for a period of up to 26 weeks, his/her weekly pay for a regularly scheduled work week (i.e., straight time only, net of taxes). A patrol officer receiving Workers Compensation during that 26 week period is required to turn over all benefit checks to the

Authority within thirty (30) days of receipt of the check. This requirement is automatic and the Authority is not required to provide notice to the patrol officer.

**Section 2.**    The parties have agreed that for the purposes of this Agreement that paragraph 3 of the Arbitration Award of September 22, 2008 will also be applicable to Corporals and Sergeants.

9.    On December 23, 2008, Officer Williams sustained a back injury while on duty as a DRPA Patrol Officer in connection with a motor vehicle accident on I-76 near the Pennrose Diner in Philadelphia Officer Williams was assigned to the Walt Whitman Bridge at that time (Exhibit B, Joint Stipulation No. 11).

10.    Officer Williams was out on Workers' Compensation from December 25, 2008 to January 24, 2011.

11.    During this time frame:

    a.  He received 100% pay from December 24, 2008 to June 21, 2009 per the Injured-on-Duty provision of the Collective Bargaining Agreement (Article XXXI).

    b.  He filed a Workers' Compensation Petition in connection with the back injury in Pennsylvania Workers' Compensation Court.  A stipulation was executed in connection with that matter on September 22, 2009.

    c.  In late 2009/early 2010, a Workers' Compensation Petition was filed in connection with the need to revise benefits in connection with a surgery.

    d.  Williams had back surgery on May 19, 2010 at Pennsylvania Hospital.

    e.  Williams continued on Workers' Compensation benefits throughout this time.

    f.  On December 7, 2010, the DRPA received a note from Dr. Scott Rushton that Williams could return to work with no restrictions.

       g.  Following receipt of the note from Dr. Rushton, the DRPA scheduled Williams for a drug and alcohol test as well as a fitness-for-duty exam prior to returning to work.

       h.  On December 10, 2010, Williams took a drug and alcohol test. The test yielded negative results.

       i.  On December 28, 2010, Williams had a fitness-for-duty examination with Dr. Lawrence Barr.

       j.  On or about January 20 or 21, 2011, the DRPA received a report from Dr. Barr concerning his examination.

       k.  Williams returned to work on January 24, 2011.[2]

12.     On February 12, 2012, Williams was placed out of service as a result of certain medications he was using for his back injury (Joint Stipulation No. 14). He was taking oxydocone, diazepam, valium, and tramadol (Joint Stipulation No. 14). He remained out from February 12, 2012 to March 6, 2012 regarding this MRO issue (Joint Stipulation No. 14).

13.     Williams grieved whether he should have been required to take sick leave during this time frame (Joint Stipulation No. 15).

14.     On October 3, 2012, the grievance was sustained at Step 3 by Deputy CEO Conallen, and Williams received 100% pay for this time period (February 12, 2012 to March 6, 2012) (Joint Stipulation No. 16).

15.     On January 21, 2013, Williams had another injury at work where he slipped on the roadway while responding to a motor vehicle accident and injured his right arm (Joint Stipulation No. 17).

---

[2] The parties agreed to a supplemental stipulation with respect to the allegations of this paragraph.

16.     Williams never sought Workers' Compensation benefits for this injury, and the DRPA subsequently closed its file (Joint Stipulation No. 18).

17.     If he testified at the arbitration in this matter, Williams would testify that he re-injured his back during the January 21, 2013 incident (Joint Stipulation No. 19).  In response, the DRPA would oppose this testimony and cross-examine Williams based on the DRPA's Workers' Compensation file for this matter (Joint Stipulation No. 19).  The parties stipulated to the Workers' Compensation file as part of the record as Joint Exhibit J-3.

18.     On or about April 9, 2013, Williams attended a medical evaluation by Dr. Christian I. Fras, MD (Joint Stipulation No. 20).  The report of Dr. Fras from this evaluation is attached as Exhibit J-4.  Williams and Dr. Fras discussed the possibility of injections at that time (Joint Stipulation No. 20).

19.     An independent medical examination ("IME") was scheduled for May 30, 2013 with Dr. Gregory Pharo to review all medications Williams was taking to be sure such medications are reasonable and necessary for the back injury (Joint Stipulation No. 21).

20.     Williams did not keep this appointment (Joint Stipulation No 22).  The DRPA filed a Workers' Compensation Petition to compel the IME (Joint Stipulation No 22).

21.     Williams appeared for the rescheduled IME on or about July 19, 2013 with Dr. Pharo, and the DRPA withdrew its Petition to compel the IME (Joint Stipulation No. 23).

22.     On or about August 15, 2013, the DRPA received the IME report of Dr. Gregory Pharo concerning Williams' progress with the back injury (Joint Stipulation No. 24). The report is attached as Exhibit J-5. Dr. Pharo did not feel that Williams was fully recovered (Joint Stipulation No. 24). Dr. Pharo agreed with the recommendation of Dr. Christian Fras dated April 9, 2013 that injections should be tried (Joint Stipulation No. 24). On page 1 of his report in the third paragraph, Dr. Pharo refers to the date of December 23, 2012 for a vehicle accident (Exhibit J-5). This should be December 23, 2008 (Joint Stipulation No. 24). Dr. Pharo notes the correct date at the top of page 1 of his report (Joint Stipulation No. 24).

23.     In the following months, DRPA continued to monitor whether the amounts of his medications were appropriate (Joint Stipulation No. 25).

24.     On April 4, 2014, Williams had another injury where his left knee hit the driver's side front-corner of his vehicle when he was returning to his patrol unit after a motor vehicle stop. Williams did not seek Workers Compensation for this injury (Joint Stipulation No. 26).

25.     In April 2014, Williams sent DRPA a note from Dr. Davis regarding a script for a corsette. He was also requesting a lumbar pillow for his work vehicle (Joint Stipulation No. 27).

26.     On May 2, 2014, Williams exhausted his available sick leave benefit time (Joint Stipulation No. 28).

27.     Williams was absent without pay on May 2, 3, 4, 7, 8, 16, 17, 18, 21, 22, 26, 27, 30, 31 and June 1, 4, 5, 15, 29, 2014 (Joint Stipulation No. 29).

28.     Williams subsequently submitted a doctor's note and an FMLA Certification of Health Care Provider dated July 1, 2014 from Dr. Christopher Davis, D.O. in connection with these absences (Joint Stipulation No. 30). The doctor's note and Certification were stipulated during the arbitration as Exhibit J-6.

29.     In response to the FMLA request, the DRPA sought a second opinion under the FMLA (Joint Stipulation No. 31). Officer Williams was notified of this by letter dated August 5, 2014 (Joint Stipulation No. 31). This letter was stipulated as Joint Exhibit J-7. The second opinion was scheduled for August 29, 2014 with the DRPA's contracted physician, Dr. Neil Kahanovitz (Joint Stipulation No. 31).

30.     Williams was out of work on July 11, 12, 13; August 10, 14, and 28, 2014 (Joint Stipulation No. 32).

31.     On August 29th, Williams had the evaluation by Dr. Kahanovitz (Joint Stipulation No. 33).

32.     Williams was out on September 5, 6, 11, and 15, 2014 (Joint Stipulation No. 34).

33.     Williams worked twelve hours on September 16, 2014. He had regular days off on September 17 and 18, 2014 (Joint Stipulation No. 35)

34.     On September 17, 2014, the DRPA received the report from Dr. Kahanovitz (Joint Stipulation No. 36). The report was stipulated as part of the record as Exhibit J-8.

35.     As a result of the report of the DRPA's contracted physician, Dr. Kahanovitz, Williams was involuntarily placed out of service by the DRPA effective

September 19, 2014 (Joint Exhibit No. 37). The DRPA re-opened his Workers' Compensation File for the December 23, 2008 back injury (Joint Exhibit No. 37). Williams' temporary total disability Workers Compensation benefits were re-activated effective September 19, 2014, and his time out of work was paid at the rate of $782.88 per week by Qual-Lynx (Joint Exhibit No. 37).[3] Twenty (20) percent of this benefit was payable to his Workers Compensation Attorney pursuant to an Order of the Workers' Compensation Court (Joint Exhibit No. 37).

36.     Williams has been out of work, per Dr. Kahanovitz's directive regarding his limitations and the DRPA's decision to place him out, since September 19, 2014 (Joint Exhibit No. 38).

37.     On September 23, 2014, then-DRPA General Counsel Danielle McNichol sent an email to Williams advising him that this was not a new or second injury (Joint Exhibit No. 39). As a result, Williams would continue to be paid $782.88 per week, but would not be entitled to Injured-On-Duty Pay under the CBA (Joint Exhibit No. 39).

38.     Ultimately, the DRPA credited Williams with FMLA for his missed work in 2014 (Joint Exhibit No. 40). Williams exhausted his FMLA leave as of October 4, 2014 (Joint Exhibit No. 40). He would not have become eligible for more FMLA leave until after March 23, 2015 and after he has worked at least 1250 hours preceding the

---

[3]  This is the same rate that was paid to Officer Williams by Scibal after June 30, 2009 when Officer Williams was receiving Workers' Compensation benefits for the injury on December 23, 2008. As noted, for the 26 weeks following the December 23, 2008 injury, Officer Williams received 100% of his pay under the Injured-on-Duty provision of the FOP agreement. The 26-week period expired in late June 2009, after which the $782.88/week rate started. See Joint Exhibit No. 37, n. 1.

leave (Joint Exhibit No. 40). This was confirmed in a letter dated November 18, 2014 from the DRPA which is attached as Exhibit J-9.

39.     By virtue of an Interest Arbitration Award dated February 23, 2015, DRPA Patrol Officers received a wage increase of 1.7% retroactive to January 1, 2011; 1.9% retroactive to January 1, 2012; 1.9 % retroactive to January 1, 2013; 1.9% retroactive to January 1, 2014; and 2.25% effective January 1, 2015 (Joint Exhibit No. 41). On January 1, 2016, DRPA Patrol Officers will receive a wage increase of 2.25%, and on January 1, 2017, a wage increase of 2.25% (Joint Exhibit No. 41). Because of contractual longevity increases, at the time Officer Williams was involuntarily placed out of work on September 19, 2014, he was receiving wages of $30.83 per hour (Joint Exhibit No. 41). If he was working at the present time, his hourly wage would be $34.05 per hour (Joint Exhibit No. 41).

40.     DRPA police officers work 12-hour shifts and either 36 hours a week, known as the "short" week, or 48 hours a week, known as the "long" week, each month (Joint Exhibit No. 42).

## II.     The Arbitrator's Award

41.     As noted, Arbitrator Visco rendered an Award which was submitted to the parties on January 4, 2016 (Exhibit A).

42.     In the Award, the arbitrator found that Williams had not fully recovered from this work-related back injury which was sustained on December 23, 2008 (Exhibit A, at 12).

43.     The arbitrator further found that Williams' "present condition and maladies stem primarily from the original injury suffered on December 23, 2008" (Exhibit A, at 12).

44.     The arbitrator reached this conclusion based on the January 21, 2013 Employee Accident Report, which made no mention of a back injury of any kind (id.). Additionally, every medical report submitted in the record refers to the accident of December 23, 2008 as the basis for the examination and conclusion reached (id.).

45.     The arbitrator further found that the Authority had ample reason to temporarily place Officer Williams on leave (id. at 12-13).

46.     The arbitrator stated, "I think a reasonable interpretation of this provision is that it relates to a specific injury (i.e., broken leg or arm, concussion, back injury, etc.) as well as the subsequent treatment of same and the natural consequences of it." See Exhibit A, at 13.

47.     After the arbitrator concluded that Williams was not entitled to additional "injured-on-duty" pay under the Collective Bargaining Agreement, the arbitrator went on to address the amount of Workers' Compensation benefits that Williams was receiving (Exhibit A, at 14-15). The arbitrator stated:

> The amount of pay that the Grievant is presently earning under WC would appear to be based on his salary in 2008. This I find to be totally unreasonable based on the fact the Grievant worked a substantial amount of time from the date of his initial return to work from the December 23, 2008 back injury to September 19, 2014 when Grievant Williams was involuntarily placed on medical leave. In light of the wage increase granted to DRPA police officers as the result of an interest arbitration award dated February 23, 2015, Grievant Williams needs to have his WC benefits increased. Such benefits should be increased based on the rate of pay in effect on September 19, 2014 as specified in the interest arbitration

award of February, 2015. To the extent that the parties can secure the agency responsible for the WC payments to disabled Authority police officers to calculate the basis for compensation to what Grievant Williams was entitled to make on the date of his placement on involuntary leave, this problem can be remediated. I hereby instruct the parties to cooperate to achieve this goal, using as a basis for the proper WC wage rate, the salary that the Grievant was entitled to be paid as of the date of his involuntary medical leave (September 19, 2014) and the accumulated wage increases that were theoretically in effect on that date (*see* again Joint Stipulation 41). To the extent that the Agency responsible for increasing Grievant's WC benefits is unable or unwilling to do this, I believe that the Authority needs to make up the difference between a $782.88 per week WC rate and the amount the above WC formula would produce after taking into consideration the wage rate of September 19, 2014 as per the interest arbitration award. This case presents a unique set of facts involving being off and on duty on numerous occasions between December 23, 2008 and Officer Williams' most recent involuntary placement out of service.

It would also be reasonable for the DRPA to consider permitting Grievant Williams to work on a regular or part time basis (two or three days per week) or, if necessary, on an intermittent basis under the terms of the FMLA effective January 15, 2016 at the then current wage rate for police officers holding the same rank as Mr. Williams. I also reject the DRPA's effort to count the 99 hours changed against Grievant as FMLA pay while he was out on involuntary leave. It is also clear to this arbitrator that whether or not an employee is entitled to IOD pay does not depend on whether or not each employee is eligible for or receiving WC pay.

**AWARD**

Grievant Williams is not entitled to IOD pay in connection wit hthe slip and fall accident of January 21, 2013 as the allegation that he experienced a new injury to his back is found to be unsubstantiated based on the stipulated facts and joint exhibits submitted in this case.

It is clear that IOD pay may be awarded whether or not it accompanies WC benefits, and I so find. Further, Grievant Williams is entitled to WC benefits based on the wage rate retroactively calculated in accordance with the interest arbitration award of February 23, 2015 (*see* § 41 of Stipulated Facts). To the extent that the agency responsible for payment of such benefits is unable or unwilling to adjust Workers' Compensation benefits currently payable to the Grievant, the DRPA shall make up the difference.

Exhibit A, at 13-14 (footnote omitted).

## COUNT ONE

### DECLARATORY AND INJUNCTIVE RELIEF
### UNDER N.J.S.A. 2A:24-1 ET SEQ. VACATING ARBITRATION AWARD

48.    The DRPA incorporates and realleges paragraphs 1-47 as if fully set forth herein.

49.    Under N.J.S.A. 2A:24-1 et seq., a party to an arbitration may seek to vacate the  award on grounds which include, but are not limited to the following:  the arbitrator applied the wrong standard of proof; the arbitrator's decision is contrary to and violates public policy; the arbitrator's decision constitutes a mistake of law; the arbitrator's decision exceeded his authority under the collective Bargaining Agreements; or the arbitrator's decision is otherwise erroneous, an abuse of discretion, an exercise of power exceeding his authority and in violation of public policy.

50.    The arbitrator's award in this matter is defective for any or all of the following reasons: the arbitrator applied the wrong standard of proof; the arbitrator's decision is contrary to and violates public policy; the arbitrator's decision constitutes a mistake of law; the arbitrator's decision exceeded his authority under the collective bargaining agreement; and the arbitrator's decision is otherwise erroneous, an abuse of discretion, an exercise of power exceeding his authority and in violation of public policy.

51.    The DRPA is unable to comply with the portion of the arbitrator's award with respect to Workers' Compensation benefits, as the DRPA is bound to comply with the Pennsylvania Workers' Compensation process, as well as a Settlement Agreement

which was reached in the Pennsylvania Workers' Compensation Court with respect to the subject injury of December 23, 2008.

52.     The portion of the arbitrator's award concerning the proper amount of Workers' Compensation benefits to be received by Williams is beyond the scope of the grievance and outside of the arbitrator's jurisdiction.

53.     The grievance at issue is not the forum to address the amount of Workers' Compensation benefits that is being received by Williams.  Rather, the proper forum is the Pennsylvania Workers' Compensation Court, which is the forum in which Officer Williams' Workers' Compensation benefits were adjudicated and resolved.

54.     The DRPA cannot be ordered to adjust Williams' Workers Compensation benefits when this issue comes within the specific jurisdiction of the Pennsylvania Workers' Compensation Court.

55.     The Collective Bargaining Agreements between the parties do not provide any arbitrator with the authority to adjudicate Workers' Compensation benefits, and as such, the arbitrator clearly exceeded his authority under such Agreements.

**WHEREFORE,** the Delaware River Port Authority demands judgment:

(1)     Vacating and setting aside the decision of the arbitrator in this matter with respect to that portion of the award concerning the payment of Workers' Compensation benefits;

(2)     Vacating and setting aside all portions of the arbitrator's award whereby the arbitrator applied the wrong standard of proof; the arbitrator's decision is contrary to and violates public policy; the arbitrator's decision constitutes a mistake of law; the

arbitrator's decision exceeded his authority under the Collective Bargaining Agreements; or the arbitrator's decision is otherwise erroneous, an abuse of discretion, an exercise of power exceeding his authority and in violation of public policy

      (3)    Awarding costs, attorneys' fees and such other relief as the Court deems just and equitable.

**BROWN & CONNERY, LLP**
*Attorneys for Delaware River Port Authority*

William F. Cook

Dated:        February 3, 2016

## DESIGNATION OF TRIAL ATTORNEY

    In accordance with R. 4:25-4, William F. Cook, Esquire, is hereby designated as trial counsel for plaintiff in the above-captioned matter.

**BROWN & CONNERY, LLP**
*Attorneys for Delaware River Port Authority*

William F. Cook

Dated:        February 3, 2016

## CERTIFICATION PURSUANT TO R. 4:5-1

I, William F. Cook, Esquire, hereby certifies as follows:

1.      To the best of my knowledge, this matter is not the subject of any other action pending in any Court or of any pending arbitration proceeding.

2.      To the best of my knowledge, no other action or arbitration proceeding is contemplated.

3.      To the best of my knowledge, there are no other parties who should be joined in this litigation at this time.

4.      I certify that the within Complaint was served within the time prescribed by the Court Rules.

5.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

                                          **BROWN & CONNERY, LLP**
                                          *Attorneys for Delaware River Port Authority*


                                          William F. Cook

Dated:          February 3, 2016

**BROWN & CONNERY, LLP**
William F. Cook, Esquire (012122003)
360 Haddon Avenue
Westmont, New Jersey 08108
(856) 854-8900
*Attorneys for Plaintiff Delaware River Port Authority*

| | |
|---|---|
| **DELAWARE RIVER PORT AUTHORITY,** | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>GENERAL EQUITY PART<br>CAMDEN COUNTY |
| **Plaintiff,** | DOCKET NO. |
| v. | Civil Action |
| **FRATERNAL ORDER OF POLICE PENN-JERSEY LODGE NO. 30 IN THE MATTER OF PAUL WILLIAMS** | **VERIFICATION** |

     I, Raymond J. Santarelli, am the General Counsel for Plaintiff Delaware River Port Authority in this matter.

     I have read the foregoing Verified Complaint. The facts from the underlying arbitration are true based upon the stipulated record of the parties, joint exhibits, and the arbitration award.

     I further certify that the statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

                                                                 Raymond J. Santarelli

Dated:        February 1, 2016

2581792.v1

# EXHIBIT "A"

## pAMERICAN ARBITRATION ASSOCIATION

**In The Matter of Arbitration Between**

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE | : | AAA Case Number |
| PENN-JERSEY LODGE 30, | : | 01-15-0002-4261 |
| | : | |
| Union, | : | Re: Injured on Duty |
| | : | Pay Eligibility |
| and | : | |
| | : | Hearing: Stipulated Facts |
| DELAWARE RIVER PORT | : | |
| AUTHORITY, | : | |
| | : | Decision Issued: December 30, 2015 |
| Employer. | : | |

### OPINION AND AWARD

**Representatives:**

**For the Union –**

Charles T. Joyce, Esquire
Spear Wilderman

**For the Employer –**

William F. Cook, Esquire
Brown & Connery, LLP

**BEFORE**

**Anthony F. Visco, Jr., Esq.**
**Arbitrator**

## BACKGROUND

The parties decided not to participate in a hearing, preferring instead to submit a joint set of stipulated facts which is set forth below:

JOINT STIPULATIONS – JUNE 15, 2015

1. The Delaware River Port Authority ("DRPA") is a bi-state agency established by Congress.

2. The governing document of the DRPA is the DRPA Compact. *See* 47 Stat. 308 (1932); 36 P.S.A. §§ 3503 to 3509; N.J.S.A. 32:3-1 to -18.

3. With respect to DRPA *governance*:

    a. The DRPA is governed by a 16-member Board of Commissioners.

    b. The Board includes eight New Jersey members who are appointed by the New Jersey Governor. The Board includes eight Pennsylvania members, six of which are directly appointed by the Pennsylvania Governor and two of which are ex-officio members (the Pennsylvania Auditor General and the Pennsylvania Treasurer).

4. The DRPA's *facilities* include the following:

    a. The Benjamin Franklin Bridge. Opened in 1932, the Benjamin Franklin Bridge connects the city of Camden with Center City Philadelphia.

    b. The Walt Whitman Bridge. The Walt Whitman Bridge opened in 1957 and extends from Gloucester City, New Jersey to South Philadelphia.

    c. The Commodore Barry Bridge. The Commodore Barry Bridge opened in 1974 and extends from Bridgeport, New Jersey to Chester, Pennsylvania.

    d. The Betsy Ross Bridge. The Betsy Ross Bridge opened in 1976 and extends from Pennsauken, New Jersey to Philadelphia.

    e. PATCO High Speed Line. The PATCO high speed line is a 24/7 electric interurban transit system extending from Lindenwold, New Jersey to Center City Philadelphia.

5. DRPA's employees are broken down into five groups:

    a. The FOP, which includes Police Officers, Corporals, and Sergeants;

    b.     The International Union of Operating Engineers (Local 542), which includes maintenance workers, electricians, mechanics, and toll collectors and a separate labor unit of civilian dispatchers;

    c.     The International Brotherhood of Electrical Workers (Local 351), which includes information services employees; and

    d.     Non-union office workers, supervisors, and technical, professional, and executive staff.

6.    The employees of PATCO, a subsidiary of the DRPA, are broken down into two groups:

    a.     The Teamsters, which includes maintenance workers, electricians, mechanics, train operators, and revenues collectors; and

    b.     Non-union office workers, supervisors, and technical, professional, and executive staff.

7.    The structure of the DRPA Department of Public Safety is the following:

    a.     Chief of Police;

    b.     Captain;

    c.     Lieutenants;

    d.     Sergeants;

    e.     Corporals; and

    f.     Police Officers

8.    The Fraternal Order of Police, Penn-Jersey Lodge 30 ("FOP") serves as the collective bargaining representative of rank-and-file and superior DRPA and PATCO officers. The FOP and the DRPA are parties to an Collective Bargaining Agreement ("CBA") which expired on December 31, 2009. The CBA is stipulated as part of the record as Exhibit J-I. After December 31, 2009, and at all times relevant to the underlying facts of this matter, the parties continued to work under the terms of the expired agreement until February 15, 2015, when an interest arbitration award was issued providing for, *inter alia,* back pay for DRPA patrol officers retroactive from January 1, 2011 to the present. *See infra,* Paragraph 41.

9.    This matter concerns a grievance filed on October 9, 2014 by the FOP on behalf of Officer Paul J. Williams. The grievance is stipulated as part of the record as Exhibit J-2.

10. The grievance is brought under Article XXXI, which states:

ARTICLE XXXI

INJURED-ON-DUTY PAY

Section 1.     For purposes of this contract term, paragraph 3 of the Arbitration Award of September 22, 2008 is hereby incorporated.  As set forth therein, any Employee injured while engaged in police activities and within the scope of his/her job assignment and applicable Work Rules, shall receive, for a period of up to 26 weeks, his/her weekly pay for a regularly scheduled work week (i.e., straight time only, net of taxes).  A patrol officer receiving Workers Compensation during that 26 week period is required to turn over all benefit checks to the Authority within thirty (30) days of receipt of the check.  This requirement is automatic and the Authority is not required to provide notice to the patrol officer.

Section 2.     The parties have agreed that for the purposes of this Agreement that paragraph 3 of the Arbitration Award of September 22, 2008 will also be applicable to Corporals and Sergeants.

11. On December 23, 2008, Officer Williams sustained a back injury while on duty as a DRPA Patrol Officer in connection with a motor vehicle accident on I-76 near the Pennrose Diner in Philadelphia.  Officer Williams was assigned to the Walt Whitman Bridge at that time.

12. He was out on Workers' Compensation from December 25, 2008 to January 24, 2011.

13. During this time frame:

a.   He received 100% pay from December 24, 2008 to June 21, 2009 per the Injured-on-Duty provision of the Collective Bargaining Agreement (Article XXXI).

b.   He filed a Workers' Compensation Petition in connection with the back injury in Pennsylvania Workers' Compensation Court.  A stipulation was executed in connection with that matter on September 22, 2009.

c.   In late 2009/early 2010, a Workers' Compensation Petition was filed in connection with the need to revise benefits in connection with a surgery.

d.   Williams had back surgery on May 19, 2010 at Pennsylvania Hospital.

3

  e. Williams continued on Workers' Compensation benefits throughout this time.

  f. On December 13, 2010, Williams was released to full-duty work per Dr. Scott Rushton and Dr. Lawrence Barr.

14. On February 12, 2012, Williams was placed out of service as a result of certain medications he was using for his back injury. He was taking oxycodone, diazepam, valium, and tramadol. He remained out from February 12, 2012 to March 6, 2012 regarding this MRO issue.

15. Williams grieved whether he should have been required to take sick leave during this time frame.

16. On October 3, 2012, the grievance was sustained at Step 3 by Deputy CEO Conallen, and Williams received 100% pay for this time period (February 12, 2012 to March 6, 2010).

17. On January 21, 2013, Williams had another injury at work where he slipped on the roadway while responding to a motor vehicle accident and injured his right arm.

18. Williams never sought Workers' Compensation benefits for this injury, and the DRPA subsequently closed its file.

19. If he testified at the arbitration in this matter, Williams would testify that he re-injured his back during the January 21, 2013 incident. In response, the DRPA would oppose this testimony and cross-examine Williams based on the DRPA's Workers' Compensation file for this matter. The parties stipulate to the Workers' Compensation file as part of the record as Exhibit J-3.

20. On or about April 9, 2013, Williams attended a medical evaluation by Dr. Christian I. Fras, MD. The report of Dr. Fras from this evaluation is attached as Exhibit J-4. Williams and Dr. Fras discussed the possibility of injections at that time.

21. An independent medical examination ("IME") was scheduled for May 30, 2013 with Dr. Gregory Pharo to review all medications Williams was taking to be sure such medications are reasonable and necessary for the back injury.

22. Williams did not keep this appointment. The DRPA filed a Workers' Compensation Petition to compel the IME.

23. Williams appeared for the rescheduled IME on or about July 19, 2013 with Dr. Pharo, and the DRPA withdrew its Petition to compel the IME.

24. On or about August 15, 2013, the DRPA received the IME report of Dr. Gregory Pharo concerning Williams' progress with the back injury. The report is attached

as Exhibit J-5. Dr. Pharo did not feel that Williams was fully recovered. Dr. Pharo agreed with the recommendation of Dr. Christian Fras dated April 9, 2013 that injections should be tried. On page 1 of his report in the third paragraph, Dr. Pharo refers to the date of December 23, 2012 for a vehicle accident. This should be December 23, 2008. Dr. Pharo notes the correct date at the top of page 1 of his report.

25.    In the following months, DRPA continued to monitor whether the amounts of his medications were appropriate.

26.    On April 4, 2014, Williams had another injury where his left knee hit the driver's side front-corner of his vehicle when he was returning to his patrol unit after a motor vehicle stop. Williams did not seek Workers Compensation for this injury.

27.    In April 2014, Williams sent DRPA a note from Dr. Davis regarding a script for a corset. He was also requesting a lumbar pillow for his work vehicle.

28.    On May 2, 2014, Williams exhausted his available sick leave benefit time.

29.    Williams was absent without pay on May 2, 3, 4, 7, 8, 16, 17, 18, 21, 22, 26, 27, 30, 31 and June 1, 4, 5, 15, 29, 2014.

30.    Williams subsequently submitted a doctor's note and an FMLA Certification of Health Care Provider dated July 1, 2014 from Dr. Christopher Davis, D.O. in connection with these absences. The doctor's note and Certification are attached as Exhibit J-6.

31.    In response to the FMLA request, the DRPA sought a second opinion under the FMLA. Officer Williams was notified of this by letter dated August 5, 2014. This letter is attached as Exhibit J-7. The second opinion was scheduled for August 29, 2014 with the DRPS's contracted physician, Dr. Neil Kahanovitz.

32.    Williams was out of work on July 11, 12, 13; August 10, 14, and 28, 2014.

33.    On August 29th, Williams had the evaluation by Dr. Kahanovitz.

34.    Williams was out on September 5, 6, 11, and 15, 2014.

35.    Williams worked twelve hours on September 16, 2014. He had regular days off on September 17 and 18, 2014.

36.    On September 17, 2014, the DRPA received the report from Dr. Kahanovitz. The report is stipulated as part of the record as Exhibit J-8.

37.    As a result of the report of the DRPA's contracted physician, Dr. Kahanovitz, Williams was involuntarily placed out of service by the DRPA effective September 19, 2014. The DRPA re-opened his Workers' Compensation File for the December 23, 2008 back injury. Williams' temporary total disability Workers

5

Compensation benefits were re-activated effective September 19, 2014, and his time out of work was paid at the rate of $782.88 per week by Qual-Lynx.[1] Twenty (20) percent of this benefit was payable to his Workers Compensation Attorney pursuant to an Order of the Workers' Compensation Court.

38.   Williams has been out of work, per Dr. Kahanovitz's directive regarding his limitations and the DRPA's decision to place him out, since September 19, 2014.

39.   On September 23, 2014, then-DRPA General Counsel Danielle McNichol sent an email to Williams advising him that this was not a new or second injury. As a result, Williams would continue to be paid $782.88 per week, but would not be entitled to Injured-On-Duty Pay under the CBA.

40.   Ultimately, the DRPA credited Williams with FMLA for his missed work in 2014. Williams exhausted his FMLA leave as of October 4, 2014. He would not have become eligible for more FMLA leave until after March 23, 2015 and after he has worked at least 1250 hours preceding the leave. This was confirmed in a letter dated November 18, 2014 from the DRPA which is attached as Exhibit J-9.

41.   By virtue of an Interest Arbitration Award dated February 23, 2015, DRPA Patrol Officers received a wage increase of 1.7% retroactive to January 1, 2011; 1.9% retroactive to January 1, 2012; 1.9% retroactive to January 1, 2013; 1.9% retroactive to January 1, 2014; and 2.25% effective January 1, 2015. On January 1, 2016, DRPA Patrol Officers will receive a wage increase of 2.25%, and on January 1, 2017, a wage increase of 2.25%. Because of contractual longevity increases, at the time Officer Williams was involuntarily placed out of work on September 19, 2014, he was receiving wages of $30.83 per hour. If he was working at the present time, his hourly wage would be $34.05 per hour.

42.   DRPA police officers work 12-hour shifts and either 36 hours a week, known as the "short" week, or 48 hours a week, known as the "long" week, each month.

/s/Charles T. Joyce, Esquire                        11/3/15
For the FOP

/s/William F. Cook, Esquire                         11/3/15
For the DRPA

---

[1] This is the same rate that was paid to Officer Williams by Scibal after June 30, 2009 when Officer Williams was receiving Workers' Compensation benefits for the injury on December 23, 2008. As noted, for the 26 weeks following then December 23, 2008 injury, Officer Williams received 100% of his pay under the Injured-on-Duty provision of the FOP agreement. The 26-week period expired in late June 2009, after which the $782.88/week rate started.

## QUESTION PRESENTED

Did the Delaware River Port Authority have the authority to deny Grievant Paul Williams injured-on-duty pay?  If not, what shall the remedy be?

## POSITION OF THE PARTIES

## EMPLOYER

The Employer argues that the effects of the back injury sustained by Grievant Paul Williams ("Grievant" or "Williams") while an active police officer for the Delaware River Port Authority ("DRPA" or "Authority") on December 23, 2008, persisted thereafter and up to the present date.  Accordingly, the right of Grievant to receive "Injured-on-Duty Pay" ("IOD") cannot exceed the original twenty-six (26) week limit set forth in the Collective Bargaining Agreement ("CBA") between the Authority and the Fraternal Order of Police, Penn-Jersey Lodge 30 ("FOP" or "Union").  This provision is set forth in Article XXXI, §1; it provides as follows:

> For purposes of this contract term, paragraph 3 of the Arbitration Award of September 22, 2008 is hereby incorporated.  As set forth therein, any Employee injured while engaged in police activities and within the scope of his/her job assignment and applicable Work Rules, shall receive, for a period of up to 26 weeks, his/her weekly pay for a regularly scheduled work week (i.e., straight time only, net of taxes).  A patrol officer receiving Workers Compensation during that 26 week period is required to turn over all benefit checks to the Authority within thirty (30) days of receipt of the check.  This requirement is automatic and the Authority is not required to provide notice to the patrol officer.

The Authority specifically notes that Grievant Williams cannot be allowed to receive IOD pay twice for the same injury.  According to the Authority, the second on-the-job injury which Grievant Williams sustained on January 21, 2013 was to his right arm and not to his

back. This is confirmed by the Employee Accident Report of the same date (Jt. Ex. 3).[2] In addition, the DRPA stresses that the IOD provision is limited to "filling the gap" between a police officer's regular pay and the officer's Workers' Compensation ("WC") benefit.

The claim of Officer Williams that he re-injured his back in the second incident that occurred on January 21, 2013, is flat out denied as being neither a "new injury" nor a significant "aggravation of his earlier injury of December 23, 2008." The DRPA claims that the clock cannot be restarted based on an unsupported claim of his back being re-injured on January 21, 2013. The DRPA emphasizes that Grievant Williams had his bite out of the "back injury apple" when he collected his full straight-time salary for 26 weeks from December 23, 2008 through June 30, 2009. This included both WC benefits and supplemental pay from the Authority in the form of IOD pay. Once Williams received his 26-weeks of supplemental IOD pay, his disability compensation was properly reduced to WC pay only to $782.88/week. Upon Grievant Williams exhausting his 26 weeks supplemental IOD pay in connection with the December 23, 2008 injury to his back, it was thereafter not available for continued back problems stemming from the December 23rd injury.

According to the DRPA, the Grievant's original back injury problems continued to dog him for the next several years up to and including the present time. As proof, the DRPA points out that Williams underwent back surgery on May 19, 2010 for said 2008 back injury. The Authority also notes that even when Williams returned to work at the end of 2010, his back problems persisted. The Authority here cites the fact that Williams thereafter treated with a variety of medications to relieve pain in his back. More important, claims the Authority,

---

[2]    This exhibit is incorrectly referred to in §19 of the Stipulated Facts report as the DRPA's "Workers' Compensation" file.

Grievant Williams had undergone evaluations performed by a number of different medical professionals. The Authority maintains that all of them pointed to the back condition having as its genesis the original back injury sustained by Williams on December 23, 2008. The Authority points specifically to an evaluation performed by Dr. Gregory Pharo (Ex. D-5) on August 15, 2013. In an extensive six-page report, Dr. Pharo stated on July 19, 2013 that while Grievant Williams is "currently able to perform his [police officer] duties" he added significantly, however, that Mr. Williams has not "fully recovered from his work-related injuries" [referring to the injury to his back which occurred on December 23, 2008].

A subsequent evaluation by Dr. Kahanovitz noted specifically that Williams "may ultimately need . . . additional surgery." Dr. Kahanovitz added: ". . . [I]f . . . he is able to work at all, it should be on a less frequent basis." Finally, Dr. Kahanovitz concluded that Grievant Williams ". . . has not reached maximum medical improvement [presumably referring to ongoing back problems as a result of his original injury of December 23, 2008]. In summary, a series of consistent medical reports, all of which trace the "back injury" condition from which Mr. Williams presently suffers to the injury he incurred on December 23, 2008 when he was involved in an motor traffic accident on I-76 while on duty.

Finally, the Authority stresses that the minor injury which Mr. Williams received on January 21, 2013 was limited to his "right arm." This occurred when he slipped on the roadway while responding to a motor vehicle accident. According to the Authority, there is no documented evidence that it had anything to do with his back. Evidence, in the form of an "Employee Accident Report" signed by the Grievant (*See* Jt. Ex. 3), clearly supports that conclusion. This contention is further supported by the medical reports prepared in connection with all of the post January 21, 2013 medical examinations.

9

The Authority thereby maintains that Officer Williams cannot now be entitled to new IOD payments in connection with his ongoing back condition. His current period of leave is in fact based on the ongoing repercussions of the original injury of 2008, the end of which is not in sight.

## UNION POSITION

The Union argues that the injuries Grievant received on January 21, 2013 included re-injury to his back as well as injury to his knee.[3] This re-injury to Grievant's back, argues the Union, qualifies Grievant Williams to receive 26 weeks of IOD pay when he was subsequently placed on involuntary medical leave on September 19, 2014.

The Union stresses that the provisions of Article XXXI do not require police officers to seek Workers Compensation benefits in order to be eligible to receive IOD pay. Injuries received while an officer is engaged in police activities alone makes such an officer eligible for IOD pay whether or not that officer applies for or receives WC benefits. Moreover, a new back injury or a reinjury to Grievant's already compromised back, cannot be totally attributed to an on-the-job injury that occurred nearly "eight (8) years" earlier.

The Union also argues that the Authority's contracted physician, Dr. Kahanovitz, stated in his report (Jt. Ex. 8) that Grievant Williams should be allowed to work, although "on a less frequent basis." Also, according to the FOP, Dr. Kahanovitz did not, in any way, suggest that Grievant could no longer perform his duties as a police officer. Nevertheless, contrary to this report, the DRPA placed Grievant Williams on involuntary leave. The Authority also unilaterally re-opened the original Workers Compensation case. Pursuant thereto, it had him

---

[3] This allegation would be supported by the Grievant's testimony had an actual hearing been held. *See* § 19 of Stipulated Facts.

10

paid under the statute at the rate of $782.85 per week, which was based on his salary in 2008-09. The DRPA also concluded that Grievant Williams be charged with time off since September 19, 2014. For purposes of FMLA benefits, the Authority improperly contended that 99 of the 504 FMLA hours be charged against the Grievant.

The 99 hours referred to by the Union that were charged against Grievant Williams were for days missed after he was involuntarily separated from employment by the DRPA. According to the Union, the DRPA cannot be allowed to count same as chargeable to FMLA. Also, according to the Union, Grievant must be compensated for this loss of benefits.

To put its case in perspective, the Union also argued that the filing of a Workers' Compensation claim by a police officer is not a condition precedent to being eligible for IOD pay. Moreover, the re-opening of the original Workers Compensation case as of September, 2014 when Grievant was placed on involuntary leave by the Authority was without justification. Equally important, according to the FOP, the Workers Compensation rate paid to the Grievant at that time did not take into account several years of allotted wage increases retroactively awarded to all DRPA police officers in February of 2015.[4]

The Union also argues that the back injury that occurred on January 21, 2013 is not significantly related to the original back injury of December 23, 2008. The Union does allow that the second injury may have exacerbated the 2008 injury, but that it nevertheless should stand alone under Article XXXI of the CBA. After all, claims the Union, the original injury occurred

---

[4]     The arbitration award granted wage increases on January 1 of each year as follows:  2011 – 1.7%; 2012 – 1.9%; 2013 – 1.9%; 2014 – 1.9%; and 2015 – 2.25%.

11

several years earlier. Finally, the Union maintains that the Grievant continued to work the vast majority of time in the intervening years, which the DRPA did not take into consideration.

**ANALYSIS AND OPINION**

The report of Dr. Pharo, dated July 19, 2013, does favor intermediate FMLA, for Mr. Williams. Specifically, Dr. Pharo said that: "as Dr. Fras has not taken him out of the work force I do not feel that it is necessary at this time." (Jt. Ex. 5). However, he also notes that Grievant Williams has not fully recovered from his work related back injury (presumably referring to the original back injury of December 23, 2008).

In addition, there is a script report by Dr. Davis, dated April 2014, indicating that Mr. Williams will need a corset and a lumbar pillow for his work vehicle. This development, when coupled with other medical exams and reports, would appear to give the Authority a reasonable basis to place Grievant Williams on compulsory leave until such time as the extent of Mr. Williams' limitations can be fully evaluated and if possible remediated.

I agree with the Authority's position that Grievant Williams' present condition and maladies stem primarily from the original injury suffered on December 23, 2008. My basis for this conclusion is primarily the January 21, 2013 Employee Accident Report which makes no mention of a back injury of any kind at that time. (Jt. Ex. 3). This, notwithstanding that Grievant would testify that both his back and his knee were injured in 2013. More important, the subject accident report was signed by Grievant Williams himself. In addition, each and every medical report submitted in this case as to the condition of Mr. Williams refers, as the basis for the examination, and the conclusions reached, the accident of December 23, 2008; *see* Jt. Ex. 4 (third line of the first paragraph of Dr. Harrop's Report of November 5, 2013; *see* Jt. Ex. 5 (heading on page one of Dr. Pharo's Report dated August 15, 2013; *see also* Jt, Ex, 6, top of page 2 where Dr. Davis on July 1, 2014 notes under the heading "date condition commenced" to

be the surgery performed on Grievant on May 10, 2010 ("surgery" necessitated by December 23, 2008 back injury). Finally, Dr. Kahanovitz notes in the heading on page 1 of his report of August 29, 2014, that the Date of Injury is 12/23/2008.

       I also find that the Authority had reason to temporarily place Grievant Williams on involuntary leave. I do not find the report of Dr. Kahanovitz to be favorable to Grievant's right to resume full time active duty as a DRPA police officer. Dr. Kahanovitz specifically said that Grievant has not reached maximum medical improvement. Dr. Kahanovitz also noted: "At this time, if, in fact, he is able to work at all, it should be on a less frequent basis." Not what I would call a ringing endorsement for Williams to resume his regular police officer duties. The IOD pay provision in § 1 of Article XXXI would appear to limit such pay to twenty-six (26) weeks for each independent injury. I think a reasonable interpretation of this provision is that it relates to a specific injury (i.e., broken leg or arm, concussion, back injury, etc.) as well as the subsequent treatment of same and the natural consequences of it.

       The amount of pay that the Grievant is presently earning under WC would appear to be based on his salary in 2008. This I find to be totally unreasonable based on the fact the Grievant worked a substantial amount of time from the date of his initial return to work from the December 23, 2008 back injury to September 19, 2014 when Grievant Williams was involuntarily placed on medical leave. In light of the wage increase granted to DRPA police officers as the result of an interest arbitration award dated February 23, 2015, Grievant Williams needs to have his WC benefits increased. Such benefits should be increased based on the rate of pay in effect on September 19, 2014 as specified in the interest arbitration award of February, 2015.[5] To the extent that the parties can secure the agency responsible for the WC payments to

---

[5]    *See* § 41 of the Stipulated Facts.

disabled Authority police officers to calculate the basis for compensation what Grievant Williams was entitled to make on the date of his placement on involuntary leave, this problem can be remediated. I hereby instruct the parties to cooperate to achieve this goal, using as a basis for the proper WC wage rate, the salary that the Grievant was entitled to be paid as of the date of his involuntary medical leave (September 19, 2014) and the accumulated wage increases that were theoretically in effect on that date (*see* again Joint Stipulation 41). To the extent that the Agency responsible for increasing Grievant's WC benefits is unable or unwilling to do this, I believe that the Authority needs to make up the difference between a $782.88 per week WC rate and the amount the above WC formula would produce after taking into consideration the wage rate of September 19, 2014 as per the interest arbitration award. This case presents a unique set of facts involving being off and on duty on numerous occasions between December 23, 2008 and Officer Williams' most recent involuntary placement out of service.

It would also be reasonable for the DRPA to consider permitting Grievant Williams to work on a regular or part time basis (two or three days per week) or, if necessary, on an intermittent basis under the terms of the FMLA effective January 15, 2016 at the then current wage rate for police officers holding the same rank as Mr. Williams. I also reject the DRPA's effort to count the 99 hours charged against Grievant as FMLA pay while he was out on involuntary leave. It is also clear to this arbitrator that whether or not an employee is entitled to IOD pay does not depend on whether or not each employee is eligible for or receiving WC pay.

**AWARD**

Grievant Williams is not entitled to IOD pay in connection with the slip and fall accident of January 21, 2013 as the allegation that he experienced a new injury to his back is found to be unsubstantiated based on the stipulated facts and joint exhibits submitted in this case.

It is clear that IOD pay may be awarded whether or not it accompanies WC benefits, and I so find.  Further, Grievant Williams is entitled to WC benefits based on the wage rate retroactively calculated in accordance with the interest arbitration award of February 23, 2015 (*see* § 41 of Stipulated Facts).  To the extent that the agency responsible for payment of such benefits is unable or unwilling to adjust Workers' Compensation benefits currently payable to the Grievant, the DRPA shall make up the difference.

Respectfully Submitted,

Anthony F. Visco, Jr.
ARBITRATOR


AMERICAN
ARBITRATION
ASSOCIATION·

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

Kenneth Egger
Vice President
230 South Broad Street, 12th Floor
Philadelphia, PA 19102
Telephone: (215) 732-5260
Fax: (215) 732-5002

January 4, 2016

Charles T. Joyce, Esq.
Spear Wilderman, PC
230 South Broad Street
Suite 1400
Philadelphia, PA 19102
Via Email to: ctjoyce@spearwilderman.com

Kristen Kirk Mayock, Esq.
Delaware River Port Authority
1 Port Center 2 Riverside Drive
P.O. Box 1949
Camden, NJ 08101
Via Email to: kkmayock@drpa.org

**Case Number: 01-15-0002-4261 AVH**

Fraternal Order of Police Penn-Jersey Lodge #30
-and-
Delaware River Port Authority
Grievance: Paul Williams Unjust Denial of Injured on Duty Pay

Dear Parties:

The hearing record was declared closed on October 21, 2015. By direction of the arbitrator, please find the duly executed award and opinion in the above-captioned matter enclosed. The arbitrator's bill for services is also enclosed. Please note that when paying the arbitrator, checks should be prepared and mailed directly to the arbitrator, not to the American Arbitration Association (AAA).

The AAA makes arbitration decisions in labor cases publicly available online in redacted full-text form through the following reporting services: Westlaw, LexisNexis, and BNA. Absent an objection within one month from the date of this letter, we will assume that you are agreeable to publication. If, however, you wish to object to publication, please advise me or send a letter directly to the AAA Publications Department at the following address:

    American Arbitration Association
    Publications Department
    120 Broadway, 21st Floor
    New York, NY 10271.

It is the AAA's policy to retain awarded cases for a maximum period of 18 months from the date of case closure. Therefore, please be advised that the above referenced physical case file, if any, will be destroyed 18 months from the date of the transmittal letter. In the normal course of our administration, the AAA may retain certain documents in our electronic records system. Such electronic records are not routinely destroyed and do not constitute a complete case file.

Thank you for choosing the American Arbitration Association.

Sincerely,

Albert C Van Horn, Jr.
Case Administrator
Direct Dial: (215) 731-6121
Email: vanhorna@adr.org
Fax: (215) 732-5002

Enclosures

cc:    William F. Cook, Esq.

        Anthony F. Visco

# EXHIBIT "B"

**FRATERNAL ORDER OF POLICE PENN-JERSEY LODGE 30 (PAUL WILLIAMS) v.
DELAWARE RIVER PORT AUTHORITY**

**AAA 01-15-0002-4261**

**JOINT STIPULATIONS – JUNE 15, 2015**

1. The Delaware River Port Authority ("DRPA") is a bi-state agency established by Congress.

2. The governing document of the DRPA is the DRPA Compact.  See 47 Stat. 308 (1932); 36 P.S.A. §§ 3503 to 3509; N.J.S.A. 32:3-1 to -18.

3. With respect to DRPA *governance*:

    a. The DRPA is governed by a 16-member Board of Commissioners.

    b. The Board includes eight New Jersey members who are appointed by the New Jersey Governor. The Board includes eight Pennsylvania members, six of which are directly appointed by the Pennsylvania Governor and two of which are ex-officio members (the Pennsylvania Auditor General and the Pennsylvania Treasurer).

4. The DRPA's *facilities* include the following:

    a. **The Benjamin Franklin Bridge.**  Opened in 1932, the Benjamin Franklin Bridge connects the city of Camden with Center City Philadelphia.

    b. **The Walt Whitman Bridge.**  The Walt Whitman Bridge opened in 1957 and extends from Gloucester City, New Jersey to South Philadelphia.

    c. **The Commodore Barry Bridge.**  The Commodore Barry Bridge opened in 1974 and extends from Bridgeport, New Jersey to Chester, Pennsylvania.

    d. **The Betsy Ross Bridge.**  The Betsy Ross Bridge opened in 1976 and extends from Pennsauken, New Jersey to Philadelphia.

    e. **PATCO High Speed Line.**  The PATCO high speed line is a 24/7 electric interurban transit system extending from Lindenwold, New Jersey to Center City Philadelphia.

5. DRPA's employees are broken down into five groups:

    a. The FOP, which includes Police Officers, Corporals, and Sergeants;

2519037.v1

b.  The International Union of Operating Engineers (Local 542), which includes maintenance workers, electricians, mechanics, and toll collectors and a separate labor unit of civilian dispatchers;

c.  The International Brotherhood of Electrical Workers (Local 351), which includes information services employees; and

d.  Non-union office workers, supervisors, and technical, professional, and executive staff.

6.  The employees of PATCO, a subsidiary of the DRPA, are broken down into two groups:

a.  The Teamsters, which includes maintenance workers, electricians, mechanics, train operators, and revenues collectors; and

b.  Non-union office workers, supervisors, and technical, professional, and executive staff.

7.  The structure of the DRPA Department of Public Safety is the following:

a.  Chief of Police;

b.  Captain;

c.  Lieutenants;

d.  Sergeants;

e.  Corporals; and

f.  Police Officers

8.  The Fraternal Order of Police, Penn-Jersey Lodge 30 ("FOP") serves as the collective bargaining representative of rank-and-file and superior DRPA and PATCO officers. The FOP and the DRPA are parties to a Collective Bargaining Agreement ("CBA") which expired on December 31, 2009. The CBA is stipulated as part of the record as Exhibit J-1. After December 31, 2009, and at all times relevant to the underlying facts of this matter, the parties continued to work under the terms of the expired agreement until February 15, 2015, when an interest arbitration award was issued providing for, *inter alia,* back pay for DRPA patrol officers retroactive from January 1, 2011 to the present. See *infra,* Paragraph 41.

9.  This matter concerns a grievance filed on October 9, 2014 by the FOP on behalf of Officer Paul J. Williams. The grievance is stipulated as part of the record as Exhibit J-2.

10. The grievance is brought under Article XXXI, which states:

## ARTICLE XXXI

### INJURED-ON-DUTY PAY

**Section 1.**     For purposes of this contract term, paragraph 3 of the Arbitration Award of September 22, 2008 is hereby incorporated.  As set forth therein, any Employee injured while engaged in police activities and within the scope of his/her job assignment and applicable Work Rules, shall receive, for a period of up to 26 weeks, his/her weekly pay for a regularly scheduled work week (i.e., straight time only, net of taxes).  A patrol officer receiving Workers Compensation during that 26 week period is required to turn over all benefit checks to the Authority within thirty (30) days of receipt of the check.  This requirement is automatic and the Authority is not required to provide notice to the patrol officer.

**Section 2.**     The parties have agreed that for the purposes of this Agreement that paragraph 3 of the Arbitration Award of September 22, 2008 will also be applicable to Corporals and Sergeants.

11. On December 23, 2008, Officer Williams sustained a back injury while on duty as a DRPA Patrol Officer in connection with a motor vehicle accident on I-76 near the Pennrose Diner in Philadelphia  Officer Williams was assigned to the Walt Whitman Bridge at that time.

12. He was out on Workers' Compensation from December 25, 2008 to January 24, 2011.

13. During this time frame:

    a. He received 100% pay from December 24, 2008 to June 21, 2009 per the Injured-on-Duty provision of the Collective Bargaining Agreement (Article XXXI).

    b. He filed a Workers' Compensation Petition in connection with the back injury in Pennsylvania Workers' Compensation Court.  A stipulation was executed in connection with that matter on September 22, 2009.

    c. In late 2009/early 2010, a Workers' Compensation Petition was filed in connection with the need to revise benefits in connection with a surgery.

    d. Williams had back surgery on May 19, 2010 at Pennsylvania Hospital.

    e. Williams continued on Workers' Compensation benefits throughout this time.

    f.   On December 13, 2010, Williams was released to full-duty work per Dr. Scott Rushton and Dr. Lawrence Barr.

14. On February 12, 2012, Williams was placed out of service as a result of certain medications he was using for his back injury. He was taking oxydocone, diazepam, valium, and tramadol. He remained out from February 12, 2012 to March 6, 2012 regarding this MRO issue.

15. Williams grieved whether he should have been required to take sick leave during this time frame.

16. On October 3, 2012, the grievance was sustained at Step 3 by Deputy CEO Conallen, and Williams received 100% pay for this time period (February 12, 2012 to March 6, 2012).

17. On January 21, 2013, Williams had another injury at work where he slipped on the roadway while responding to a motor vehicle accident and injured his right arm.

18. Williams never sought Workers' Compensation benefits for this injury, and the DRPA subsequently closed its file.

19. If he testified at the arbitration in this matter, Williams would testify that he re-injured his back during the January 21, 2013 incident. In response, the DRPA would oppose this testimony and cross-examine Williams based on the DRPA's Workers' Compensation file for this matter. The parties stipulate to the Workers' Compensation file as part of the record as Exhibit J-3.

20. On or about April 9, 2013, Williams attended a medical evaluation by Dr. Christian I. Fras, MD. The report of Dr. Fras from this evaluation is attached as Exhibit J-4. Williams and Dr. Fras discussed the possibility of injections at that time.

21. An independent medical examination ("IME") was scheduled for May 30, 2013 with Dr. Gregory Pharo to review all medications Williams was taking to be sure such medications are reasonable and necessary for the back injury.

22. Williams did not keep this appointment. The DRPA filed a Workers' Compensation Petition to compel the IME.

23. Williams appeared for the rescheduled IME on or about July 19, 2013 with Dr. Pharo, and the DRPA withdrew its Petition to compel the IME.

24. On or about August 15, 2013, the DRPA received the IME report of Dr. Gregory Pharo concerning Williams' progress with the back injury. The report is attached as Exhibit J-5. Dr. Pharo did not feel that Williams was fully recovered. Dr. Pharo agreed with the recommendation of Dr. Christian Fras dated April 9, 2013 that injections should be tried. On page 1 of his report in the third paragraph, Dr. Pharo

refers to the date of December 23, 2012 for a vehicle accident. This should be December 23, 2008. Dr. Pharo notes the correct date at the top of page 1 of his report.

25. In the following months, DRPA continued to monitor whether the amounts of his medications were appropriate.

26. On April 4, 2014, Williams had another injury where his left knee hit the driver's side front-corner of his vehicle when he was returning to his patrol unit after a motor vehicle stop. Williams did not seek Workers Compensation for this injury.

27. In April 2014, Williams sent DRPA a note from Dr. Davis regarding a script for a corsette. He was also requesting a lumbar pillow for his work vehicle.

28. On May 2, 2014, Williams exhausted his available sick leave benefit time.

29. Williams was absent without pay on May 2, 3, 4, 7, 8, 16, 17, 18, 21, 22, 26, 27, 30, 31 and June 1, 4, 5, 15, 29, 2014.

30. Williams subsequently submitted a doctor's note and an FMLA Certification of Health Care Provider dated July 1, 2014 from Dr. Christopher Davis, D.O. in connection with these absences. The doctor's note and Certification are attached as Exhibit J-6.

31. In response to the FMLA request, the DRPA sought a second opinion under the FMLA. Officer Williams was notified of this by letter dated August 5, 2014. This letter is attached as Exhibit J-7. The second opinion was scheduled for August 29, 2014 with the DRPA's contracted physician, Dr. Neil Kahanovitz.

32. Williams was out of work on July 11, 12, 13; August 10, 14, and 28, 2014.

33. On August 29th, Williams had the evaluation by Dr. Kahanovitz.

34. Williams was out on September 5, 6, 11, and 15, 2014.

35. Williams worked twelve hours on September 16, 2014. He had regular days off on September 17 and 18, 2014.

36. On September 17, 2014, the DRPA received the report from Dr. Kahanovitz. The report is stipulated as part of the record as Exhibit J-8.

37. As a result of the report of the DRPA's contracted physician, Dr. Kahanovitz, Williams was involuntarily placed out of service by the DRPA effective September 19, 2014. The DRPA re-opened his Workers' Compensation File for the December 23, 2008 back injury. Williams' temporary total disability Workers Compensation benefits were re-activated effective September 19, 2014, and his time out of work was

paid at the rate of $782.88 per week by Qual-Lynx.[1] Twenty (20) percent of this benefit was payable to his Workers Compensation Attorney pursuant to an Order of the Workers' Compensation Court.

38. Williams has been out of work, per Dr. Kahanovitz's directive regarding his limitations and the DRPA's decision to place him out, since September 19, 2014.

39. On September 23, 2014, then-DRPA General Counsel Danielle McNichol sent an email to Williams advising him that this was not a new or second injury. As a result, Williams would continue to be paid $782.88 per week, but would not be entitled to Injured-On-Duty Pay under the CBA.

40. Ultimately, the DRPA credited Williams with FMLA for his missed work in 2014. Williams exhausted his FMLA leave as of October 4, 2014. He would not have become eligible for more FMLA leave until after March 23, 2015 and after he has worked at least 1250 hours preceding the leave. This was confirmed in a letter dated November 18, 2014 from the DRPA which is attached as Exhibit J-9.

41. By virtue of an Interest Arbitration Award dated February 23, 2015, DRPA Patrol Officers received a wage increase of 1.7% retroactive to January 1, 2011; 1.9% retroactive to January 1, 2012; 1.9 % retroactive to January 1, 2013; 1.9% retroactive to January 1, 2014; and 2.25% effective January 1, 2015. On January 1, 2016, DRPA Patrol Officers will receive a wage increase of 2.25%, and on January 1, 2017, a wage increase of 2.25%. Because of contractual longevity increases, at the time Officer Williams was involuntarily placed out of work on September 19, 2014, he was receiving wages of $30.83 per hour. If he was working at the present time, his hourly wage would be $34.05 per hour.

42. DRPA police officers work 12-hour shifts and either 36 hours a week, known as the "short" week, or 48 hours a week, known as the "long" week, each month.

_____          _____
Charles T. Joyce, Esquire                     Date          11/3/15
For the FOP

_____          _____
William F. Cook, Esquire                      Date          11/3/15
For the DRPA

---

[1] This is the same rate that was paid to Officer Williams by Scibal after June 30, 2009 when Officer Williams was receiving Workers' Compensation benefits for the injury on December 23, 2008. As noted, for the 26 weeks following the December 23, 2008 injury, Officer Williams received 100% of his pay under the Injured-on-Duty provision of the FOP agreement. The 26-week period expired in late June 2009, after which the $782.88/week rate started.

BROWN & CONNERY, LLP
William F. Cook, Esquire
360 Haddon Avenue
Westmont, New Jersey 08108
(856) 854-8900

| | |
|---|---|
| **IN THE MATTER OF THE ARBITRATION BETWEEN THE FRATERNAL ORDER OF POLICE, PENN-JERSEY LODGE 30** **and** **DELAWARE RIVER PORT AUTHORITY** **Grievance:    Paul Williams Unjust Denial of Injured-on-Duty Pay** | American Arbitration Association Case No. 01-15-0002-4261 Arbitrator: Anthony F. Visco |

## JOINT EXHIBITS

1

# AGREEMENT BETWEEN

# DELAWARE RIVER PORT AUTHORITY

# AND

# FRATERNAL ORDER OF POLICE LODGE 30

**Term:  January 1, 2005 through December 31, 2009 (Patrol Officers)**

**Term:  July 1, 2007 through December 31, 2009 (Corporals and Sergeants)**

With regard to members of the FRATERNAL ORDER OF POLICE, LODGE 30 (hereinafter referred to as the "FOP" or "LODGE 30") who are employed as patrol officers, this Agreement between the DELAWARE RIVER PORT AUTHORITY (hereinafter referred to as the "DRPA") and the FOP is effective as of the **22nd** day of **September,** 2008. With regard to members of the FOP's SUPERIOR OFFICERS ASSOCIATION (hereinafter referred to as the "SOA"), who are employed as Corporals and Sergeants, whose terms and conditions of employment were negotiated separately by the FOP whose membership the FOP wishes to have treated as a committee within the FOP and to have included under this single Agreement in furtherance of administrative efficiency, this Agreement between the DRPA and the FOP will be effective on the _____ day of _____ 2009.

## ARTICLE I

This Agreement shall replace and supersede any previous Agreements between the Delaware River Port Authority and bargaining representatives for police classified as patrol officers, Corporals and Sergeants.

## ARTICLE II
## RECOGNITION

**Section 1.**    FOP Lodge 30 have requested that DRPA enter into a single, consolidated contract covering Patrol Officers, Corporals and Sergeants to replace and supersede the separate contracts that previously existed between DRPA and FOP Lodge 30 (for Patrol Officers) and between DRPA and FOP Lodge 30 – Superior Officers Association (for Corporals and Sergeants).  In support of this request FOP Lodge 30 including representatives of Corporals and Sergeants as well as representatives of Patrol Officers, has explained that FOP Lodge 30 – Superior Officers Association has never existed as a free standing or separate entity, it is solely a committee within FOP Lodge 30.  In addition, the two contracts are substantially similar, though not identical. DRPA has agreed to enter into a single consolidated contract covering Patrol Officers, Corporals and Sergeants provided that appropriate distinctions are made between the two groups. Therefore, DRPA recognizes FOP Lodge 30 as the sole and exclusive representative for all Patrol Officers, Corporals and Sergeants employed by the DRPA Department of Public Safety.  The term "Employee" or "Employees", as used throughout this Agreement, shall include Patrol Officers, Corporals and Sergeants, unless otherwise delineated.

**Section 2.**    This unit shall apply to DRPA or to any subsidiary corporation it forms to operate bridges after the date of this Agreement and shall apply to the bridges and approaches and bridge-associated structures thereto currently operated by DRPA and to any other bridge constructed and operated by Delaware River Port Authority in the future and it shall also apply to.  This unit shall also apply to the facilities owned by

DRPA and operated by the Port Authority Transit Corporation (PATCO) as the said facilities exist as of the execution of this Agreement.

**Section 3.**    If during the period of this Agreement a new bridge is constructed and operated by DRPA, the FOP agrees that Employees may be transferred to a new location to assist in the operation of the new bridge facility or breaking in of new personnel, or the general startup of the new facility. In connection with such assignments, the patrol officers shall not be adversely affected in their seniority rights granted in this Agreement.

**Section 4.**    It is recognized that the DRPA is subject to and governed by the respective Police Powers Acts of the Commonwealth of Pennsylvania and the State of New Jersey.

**Section 5.**    This Agreement shall bind and inure to the benefit of the successors and assigns of the parties signatory hereto.

**Section 6.**    The DRPA and FOP agree that no action will be taken for the purpose of discriminating against any Employee because of union membership or activities, race, color, creed, age, sex, national origin, marital status, political affiliation or activity, or non job-related disability, except where sex or age is a bona fide occupational qualification.

**Section 7.**    The FOP and its members who serve as DRPA Corporals and Sergeants expressly acknowledge that the supervisory responsibilities of Corporals and Sergeants are paramount element of each job function, and that said supervisory obligation must take precedence over loyalty to the FOP in the assessment and management of patrol officers who are also members of the FOP.

**Section 8.**    References in this Agreement to one gender shall be deemed to include both genders. References to the plural or the singular shall each be deemed to include the other.

## ARTICLE III
## MAINTENANCE OF STANDARDS/
## TRAINING/DISCIPLINE/DISCOVERY

**Section 1.**    Notwithstanding any provision in this Agreement, the Delaware River Port Authority shall not require any Employee to perform the work of any member of another DRPA bargaining unit in the event of a strike by members of any Labor Organization covered by a Collective Bargaining Agreement with the DRPA. Provided, however, that in the event of such a strike, Employees will continue to take such actions as are required to protect the safety of the traveling public, DRPA employees, and DRPA property. Such actions may include performing work of the members of Local 542 but only to the limited extent necessary to assure the safety of the traveling public, DRPA

employees, and DRPA property. In no event shall an Employee be required to collect tolls if there is no emergency. An emergency shall be defined to include any situation where the safety of the traveling public or DRPA employees are at risk.

**Section 2.**   It is recognized that the business of the DRPA is to render efficient and courteous service to the public and the FOP and its members agree that Employees should present a neat appearance, be efficient and courteous.

**Section 3.**   The DRPA may establish reasonable standards of performance and take steps to upgrade the skills of Employees

**Section 4.**   All Employees will be provided with equal access to training programs approved by the DRPA; provided that certain training programs may be available only to Patrol Officers, other programs may be available only to Corporals and Sergeants, and some programs may be available only to one or the other of Corporals and Sergeants. The following procedure will be applied:

All training programs approved by DRPA shall be announced at all Facilities. All Employees who are eligible for any particular training program may apply for that program. If more than one eligible Employee applies for any such training program, the DRPA shall determine in its sole discretion who may attend same.

(A)   This procedure shall not apply to recertifications or to programs involving Special Units.

**Section 5.**   The DRPA may from time to time assign Employees to work at any bridge, but an assignment or transfer of from one bridge to another shall not be done for disciplinary purposes, and shall be done for operational reasons only. An Employee who after arriving at work must work at another bridge shall be transported in a patrol vehicle.

**Section 6.**

(A)   It is recognized that the DRPA may discipline Employees up to and including discharge for just cause. The FOP shall be notified in writing of all such disciplinary action by the DRPA, via copies of all disciplinary charges or notices relating to disciplinary action against any Employee being hand delivered to the President of the FOP or his designee within forty-eight (48) hours of presentation of such charges.

(B)   No Employee who has completed his probation shall be disciplined for other than just cause.

(C)   When disciplining a Patrol Officer neither the DRPA nor any arbitrator reviewing any discipline or grievance arising there from shall give consideration to such Patrol Officer's Employee's discipline record more than two (2) years before the incident giving rise to the current discipline.

- 4 -

(D)    When disciplining a Corporal or Sergeant the Authority or any Arbitrator reviewing any discipline or any grievance arising there from may give consideration to such Corporal or Sergeant's record, including but not limited to discipline, over the entire length of service for the Authority.

(E)    The DRPA will provide discovery to, or allow inspection of evidence by, the FOP within five (5) days following the imposition of discipline. Within five (5) days of its inspection of the DRPA's evidence, the FOP shall allow DRPA to inspect all evidence that it intends to use in contesting the imposition of discipline. "Inspection of evidence" within the meaning of this section refers to the right of the parties to inspect and make copies of all documents or other evidence in the custody or possession of the other party which is used either by the DRPA to justify the disciplinary action, or by the FOP to contest the disciplinary action.

(F)    If an Employee is suspended without pay as a result of a disciplinary process then (i) the officer may choose to advise management in the Department of Public Safety that he or she would like to be charged for a vacation day (assuming that the officer has vacation days available, and if not then this section shall not apply) for each day of the suspension, then (ii) management in the Department of Public Safety shall promptly determine whether they wish to accept the Employee's proposal based upon considerations of operational need and issues related to the underlying disciplinary process. If management is prepared to accept the Employee's proposal, then the Employee will be permitted to work his or her regular shift instead of being suspended and will be paid for the time worked with the said time being charged to the Employee's vacation time. If management declines the Employee's proposal, the Employee shall be suspended without pay. The disciplinary record shall not be affected by the decisions reached under this section.

## ARTICLE IV
## DUES

**Section 1.**    DRPA agrees that subject to any applicable law it will deduct from the wages of its Employees who at the time of the signing of this Agreement are members of the FOP and who authorize such deduction, the FOP established initiation fee and regular weekly dues, as certified by the FOP. The amount so deducted shall be paid to Lodge 30. This clause shall also apply to an Employee who joins the FOP after the signing of this Agreement.

**Section 2.**    The initiation fee shall be deducted from the first five (5) pays received by the Employee following the execution and delivery of the authorization card. The dues shall be deducted from the weekly pay of the Employee.

**Section 3.**     A facsimile of the authorization card to be used for the deduction shall be as follows:

"To the Delaware River Port Authority":

"I, the undersigned, an employee of the Delaware River Port Authority, authorize the Delaware River Port Authority to deduct from my wages an initiation fee and weekly dues and to remit the amount so deducted to Lodge 30, Fraternal Order of Police at its offices in Philadelphia, Pennsylvania."

"This authorization shall be irrevocable for a period of one year and shall automatically renew itself for a successive yearly period unless I give written notice to the Delaware River Port Authority at least sixty (60) days and not more than ninety (90) days before any periodic renewal of this authorization of my desire to revoke the same or the FOP ceases to be the exclusive bargaining agent."

Signature _____

Date _____

Address _____

_____

Employee's No. _____

This authorization card is subject to further revocation pursuant to Section 8 of this Article.

**Section 4.**     If any Employee shall at any time claim that the Delaware River Port Authority acted wrongfully or improperly in making any check off of dues or initiation fee, the FOP will defend, indemnify and hold harmless the Delaware River Port Authority from any such claims.

**Section 5.**     It is a continuing condition of employment that on the effective date of this Agreement, all Employees who are, or who thereafter become members of the FOP, shall during the term of this Agreement remain members of the FOP.

**Section 6.**     The FOP will notify the DRPA in writing that an FOP member has failed or refused to tender the initiation fee and/or FOP dues. This notice is to be dated and signed by the proper FOP officials. The DRPA shall be given seven (7) calendar days from receipt of notice before action is taken on the Employee.

**Section 7.** The DRPA, if it has been given proof positive that the FOP dues or initiation fees have not been paid, shall terminate the employment of any such Employee who within seven (7) days after receipt of the DRPA of such written notice pursuant to Section 6 of this Article has not paid the FOP initiation fee and regular weekly FOP dues.

**Section 8.** The parties have agreed that the following terms shall apply irrespective of any inconsistent provision in the foregoing, namely, that subject to the provisions of Section 9 of this Article, any Employee may by letter not only resign from the FOP, but also revoke any existing dues deduction authorization at any time during the last thirty (30) days of this contract. Any such resignation or revocation letter shall be effective as of 12:01 a.m. the day following the expiration of this Agreement.

**Section 9.**

(A)   Representation Fee. DRPA agrees that subject to any applicable law, the FOP shall be entitled to a representation fee from any Employee who elects not to join the FOP under the provisions of Article IV of this Agreement. Such fee shall be in lieu of Employee dues paid to the FOP by its members for collective bargaining and contract administration services rendered by the FOP on behalf of all Employees covered by this Agreement.

(B)   The representation fee, which shall be paid by payroll deduction as hereafter set forth, shall be in an amount equivalent to that part of the FOP's regular dues which does not represent expenses for benefits inuring only to its members or political and ideological activities, but in no event shall such representation fee exceed eighty-five percent (85%) of the FOP's regular membership dues.

(C)   As a condition of the above deduction, DRPA shall be provided by the FOP an annual statement from its independent auditors setting forth information sufficient to confirm the amount of its Employees' membership dues which benefits only its members and the cost of any expenditures by the FOP for political or ideological activities.

(D)   Payroll Deductions - This Section 9 shall become effective upon receipt by DRPA from the FOP of the statement prescribed by Section 9C. Thereafter, upon successful completion by a Employee of sixty (60) days of employment, DRPA will deduct the appropriate percentage of the FOP Employees' membership dues from the pay received by the affected patrol officer each pay period. Such fee shall be transmitted to the FOP under separate identification with dues provided for in Article IV, Section 1.

(E)   The FOP agrees to cooperate fully with DRPA should there be any claim that DRPA acted wrongfully or improperly in making any deduction of the

- 7 -

representation fee provided herein. The FOP further shall indemnify and save DRPA harmless against any and all claims, suits or other forms of liability that shall arise out of action taken by DRPA for the purpose of complying with the provisions of this Section 9.

## ARTICLE V
## LODGE RIGHTS

**Section 1.**    DRPA will excuse, with pay, one Employee to attend grievances and arbitrations as FOP representative.

**Section 2.**    DRPA will excuse, with pay, that number of Employees allowed pursuant to FOP Grand Lodge rules to attend the annual National or State convention, only one of which occurs each year.

## ARTICLE VI
## MANAGEMENT RIGHTS WITH REGARD TO PATROL OFFICERS

**Section 1.**    The DRPA reserves to itself as employer all management functions, including but not limited to the full and exclusive right to assign and transfer patrol officers, whether temporarily or permanently, to schedule work and to contract out or sub-contract the same, to adopt reasonable rules and regulations governing the workforce, and solely to direct all operations affecting the Police Department, subject to the terms and conditions of this Agreement.

**Section 2.**    Nothing in this Agreement shall be construed to permit the FOP or any of its members to assume that they have authority to officiate in any managerial or supervisory capacity.

## ARTICLE VII
## MANAGEMENT RIGHTS WITH REGARD TO SUPERIOR OFFICERS

**Section 1.**  The Union recognizes the exclusive right of the Authority to determine its operating policies and manage its business in light of its experience, business judgment and changing conditions. It is understood and agreed that all rights, powers or authority possessed by the Authority prior to the signing of this Agreement whether exercised or not shall be retained by the Authority except where expressly abridged by a specific provision of this Agreement.

**Section 2.**    Except where expressly abridged by a specific provision of this Agreement, the Authority retains the sole and exclusive right to hire, promote, transfer, assign, schedule, and otherwise direct the Corporals and Sergeants covered by this

Collective Bargaining Agreement ; to discipline, demote, suspend or discharge for just cause; to evaluate and determine the qualifications of and selection of personnel and Corporals and Sergeants for promotion; to establish performance standards; to transfer Corporals and Sergeants from one job assignment or shift or location to another, either temporarily or permanently; to determine the number and arrangement of work shifts and the number of Corporals and Sergeants to be assigned to each; to determine the starting and stopping time for each shift and each Corporal and Sergeant and when breaks may be taken; to relieve Corporals and Sergeants from duty because of lack of work; to determine the number of hours of work and the amount of compulsory overtime to be worked; to establish rules, regulations and policies; to establish new job classifications and departments; to determine the way in which the Authority's services shall be provided to the public; to determine the method of training Corporals and Sergeants; to organize, discontinue, enlarge or reduce a department or function; to assign Corporals and Sergeants to other departments as operations may require; to introduce new or modified facilities; to introduce a change in the method or methods of operation which will produce a change in job duties and reduction in personnel; the unrestricted right to give or assign work to outside contractors for any lawful reason; and the right to carry out the ordinary and customary functions of management in the sole and exclusive judgment of the Authority.

    **Section 3.**   The above rights of the Authority are not all inclusive, but indicate the type of matters or rights which belong to and are inherent to the Authority.

## ARTICLE VIII
## SENIORITY

    **Section 1.**   The length of service or seniority with DRPA of all patrol officers shall be computed from the date of hiring of each patrol officer's last period of continuous employment at DRPA in this bargaining unit.

(A) There shall be three seniority dates for each Corporal and four seniority dates for each Sergeant. One seniority date will be his/her date of hire with the Authority and will be designated the "Overall Length of Service" or "Authority Seniority" list. The second will be entitled "Department Seniority" and is defined as the overall length of continuous service as a sworn officer in the Delaware River Port Authority Department of Public Safety and/or in the PATCO Police Department. The third will be "Corporal Seniority" which is defined as unbroken, continuous time in rank as a Corporal. The fourth will be "Sergeant Seniority" which is defined as unbroken, continuous time in rank as a Sergeant. All matters affected by Department Seniority will be determined for Sergeants separately from determinations for Corporals.

(B) In the event that two or more people are promoted to the rank of Sergeant on the same day, seniority will be determined by Corporal Seniority. In the event of a tie between Sergeants or in the event that two or more people are promoted to the rank of Corporal on the same day, seniority will be determined by Department Seniority. If Department Seniority is the same,

- 9 -

then seniority will be determined by Overall Length of Service seniority. If Overall Length of Service is the same, then the Employees will determine seniority by drawing lots.

**Section 2.**    The DRPA shall prepare and keep available all appropriate seniority lists. The seniority lists shall be updated semi-annually and copies provided to the FOP.

**Section 3.**    Qualified applicants for the position of patrol officers will be hired without regard to the source of application. Patrol officers shall be considered as probationary during the first twelve (12) months of their employment and may be terminated, laid off, promoted, demoted, disciplined, or transferred at the sole discretion of the DRPA, and they shall not be entitled to utilize the provisions of the grievance procedure. Each new patrol officer must successfully complete a training course at an approved Police Academy within his twelve (12) calendar month probationary period as a condition of his employment.

**Section 4.**    DRPA may employ temporary summer employees from May 1 through October 1 in any calendar year. Such employees shall perform administrative work only and not patrol police work and shall not accumulate seniority.

**Section 5.**
(A) An Employee in this bargaining unit may apply for a position in a bargaining unit of other employees, or a non-represented position in another department, and DRPA may grant the transfer. An Employee who is thus voluntarily transferred to another department shall retain his seniority in the Division of Public Safety/Police for a period of six (6) months, which will inure to him if he returns to his previous position in the Division of Public Safety/Police within six (6) months.
(B)

**Section 6.**    Department seniority shall be based upon a patrol officer's continuous length of service in the Division of Public Safety/Police.

**Section 7.**    If a patrol officer promoted to Corporal or Sergeant is demoted to the rank of patrol officer, his/her seniority will revert to the date he/she was hired for calculation of all seniority based rights and entitlements.

**Section 8. Promotion out of the Bargaining Unit.** Corporals or Sergeants who are promoted to a managerial position will continue to accumulate Departmental seniority for a period of six (6) months, provided that they return to their former position within such time period.

**Section 9.** Any seniority rights inuring to any Patrol Officer shall terminate on:

(A)    Discharge;
(B)    Voluntary termination of employment (resignation or retirement);

- 10 -

(C)    Failure to return to work at the expiration of an approved leave-of-absence, without an excuse acceptable to DRPA;

(D)    Failure to report to work for three (3) consecutive days without notice to the DRPA or without an excuse for failure to give such notice acceptable to DRPA;

(E)    Absence from work because of sickness or accidental injuries for a period of two (2) years. During such period, the patrol officer shall accumulate seniority. Before the expiration of the two-year period, patrol officers may apply for a special leave of absence; and

(F)    Layoff in excess of two (2) years or failure to return to active duty within one week of notice of recall during such two-year period.

**Section 10.**    Irrespective of the seniority provision in the Agreement, An Employee who is temporarily disabled from regular work as a result of accident, or sickness may be transferred to available jobs within the Public Safety Department at the discretion of the DRPA.

**Section 11.**    Any seniority rights inuring to any Corporal or Sergeant will terminate on: Any seniority rights inuring to any Employee shall terminate on:

A.    Discharge;

B.    Voluntary termination of employment (resignation or retirement);

C.    Failure to return to work at the expiration of an approved leave-of-absence, without an excuse acceptable to the Authority;

D.    Failure to report to work for three (3) consecutive days without notice to the Authority or without an excuse for failure to give such notice acceptable to the Authority;

E.    Absence from work because of sickness or accidental injuries for a period of one (1) year, or at an earlier date if the Employee is deemed permanently disabled from performing his/her job and is eligible for long-term disability or worker's compensation. This one-year period shall be defined as a cumulative one (1) year relating to any illness or injury, or any combination of illnesses and/or injuries, including recurrence or aggravation thereof, within any two (2) year period. During the said two year period the Employee shall accumulate seniority. Before the expiration of the one year period, the Employee may apply for a special leave of absence.

F.    Layoff in excess of one (1) year or failure to return to active duty within one week of notice of recall during such two-year period.

## ARTICLE IX
## TRANSFERS

**Section 1.**    The issue of transfers as it relates to Patrol Officers is addressed in the Arbitration Award of September 22, 2008, and accordingly, such discussion in that Award is incorporated herein as Attachment A.

The issue of Transfers as it relates to Corporals and Sergeants is addressed in Article VII "Management Rights"

# ARTICLE X
# LAYOFFS

**Section 1.**     Layoffs shall be made within each rank of Employee separately; that is, within the Patrol Officer category, within the Corporal rank, and within the Sergeant rank.

    (A) Layoffs among Sergeants will be made according to inverse order of Department Seniority, provided that skill and ability, as determined by the Authority, is relatively equal.

    (B) Layoffs among Corporals will be made according to inverse order of Department Seniority, provided that skill and ability, as determined by the Authority, is relatively equal.

    (C) Layoffs among Patrol Officers will be made according to inverse order to Department seniority, provided that skill and ability, as acquired during the course of DRPA employment, is relatively equal.

**Section 2.** Bumping Rights.  A Sergeant who is the subject of a layoff shall have the right to bump a Corporal with less Department Seniority.  A Corporal who is the subject of layoff, or who is bumped by a Sergeant as provided above, will have the right to bump a Patrol Officer with less Department Seniority.  In each case the officer who is bumped will be the officer in the relevant rank who has the least Department Seniority within that rank.

**Section 3.**     Recall rights for Patrol Officers shall obtain for a period of two (2) years from layoff, and shall be offered to the most senior Employee on layoff who occupied the rank in which the recall is offered prior to being laid off.

    (A) Recall rights for Corporals and Sergeants will pertain for a period for one (1) year from layoff and will be offered to the most senior Sergeant or Corporal on layoff depending on which position is to be filled.

**Section 3.**     The failure to accept a recall within one week of notice shall terminate the Employee's seniority for all purposes forthwith.

**Section 4.**     Notice of recall shall be sent by certified mail to the last known address on record at the DRPA. It shall be the Employee's duty to keep DRPA informed of any address changes during the two-year recall rights period (for Patrol Officers) or the one year recall rights period (for Sergeants and Corporals).

# ARTICLE XII
# TEMPORARY REASSIGNMENT TO HIGHER PAID CLASSIFICATION

If an Employee is required by Management to work in a higher ranking position within the Bargaining Unit or outside of the Bargaining Unit but within the Department of

Public Safety then the following provisions will apply:  following notice from Management directing the Employee to work in the specified higher ranking position, if the Employee works in the said higher ranking position for eight (8) consecutive days then the employee will be entitled to be paid the wage rate assigned to the said higher ranking position and the higher wage rate will be retroactive to the first day in of work in the said higher ranking position. Provided also that the Corporal rank includes responsibility for performing as a Sergeant when an assigned Sergeant is absent due to Request or Vacation time so this provision will not require that a Corporal be paid at the higher rate when filling in for an absent Sergeant when the reason for the absence is Request or Vacation. If a Sergeant is absent due to illness or injury (on duty or off duty) and if the Corporal performs the work of the Sergeant for the time period set forth above, then the Corporal will be entitled to be paid at the Sergeant rate while performing these duties.

## ARTICLE XIII
## NO-STRIKE CLAUSE

During the term of this Agreement, the FOP and its members shall not authorize, call, support, sanction, approve or take part in any strike, slowdown, reporting of pretended illness or the cessation of work, and they agree not to sponsor, authorize, call, support, sanction, approve or take part in any sympathy strike, secondary boycott or political strike.

Any Employee who violates this Article may be deemed to have terminated his or her employment.

## ARTICLE XIV
## GRIEVANCE PROCEDURE

**Section 1.** Should any difference arise between the DRPA and any Employee who has completed his probationary period as to the meaning or application of this Agreement, or the policy and/or procedures affecting the terms and conditions of employment, such difference or dispute shall constitute a grievance and shall be settled in the following manner; provided that whenever an FOP representative is authorized to appear on behalf of a Grievant, that FOP representative should be selected in order to avoid conflicts of interest. Specifically, a Corporal or Sergeant should not appear to represent a Patrol Officer who is grieving discipline imposed by another Corporal or Sergeant.

**A.** **Informal Level** – An Employee may orally and informally present any grievance arising out of employment to the grievant's immediate supervisor, in an attempt to settle same. The Employee may have an FOP representative present if he desires. This informal level is not required but encouraged and shall not apply to grievances involving any disciplinary actions, reprimands, suspensions and/or discharges, which shall be referred to the first level within the specified time.

B.    **First Level** – A grievance must be submitted in writing by the FOP to the grievant's Lieutenant-in-charge within ten (10) calendar days from the act or event which is the subject of the grievance or ten (10) calendar days from the date on which the FOP acquired knowledge of the act or event which is the subject of the grievance. The Lieutenant shall provide the grievant with a written determination within ten (10) calendar days of receipt of the grievance.

C.    **Second Level** – In the event the grievance is not satisfactorily resolved, or responded to, the FOP must further submit the grievance within ten (10) calendar days from the first level decision, or lack thereof, to the Police Chief. The Police Chief shall provide a written determination within ten (10) calendar days of receipt of the grievance.

D.    **Third Level** – In the event the grievance is not satisfactorily resolved or responded to, the FOP must further submit the grievance, within ten (10) calendar days from the second level decision, or lack thereof, to the Chief Public Safety Officer or his designee, who shall provide a written determination within ten (10) calendar days of receipt of the grievance.

E.    **Fourth Level** – In the event the grievance is not satisfactorily resolved, or responded to, the FOP may further submit the grievance, within forty-five (45) days from the decision or lack thereof in the third level, to the American Arbitration Association or another agreed-upon arbitration association, in accordance with its rules and regulations. The arbitrator, in his decision, shall be guided by the interests of the parties herein and the arbitrator shall have no power to add to, alter, amend or repeal this Agreement, any provisions thereof, or to fix or change any rate or rates of pay. The expenses of the arbitrator and the expenses of the American Arbitration Association shall be borne one-half (1/2) by the DRPA and one-half (1/2) by the FOP.

F.    A grievant, his FOP representative, or if any Employee or non bargaining unit employee who is a witness relevant to the grievance, who attends a scheduled grievance hearing while on duty, shall not be required to make up such time or the reasonable time required to travel to and from such meeting. Any such FOP representative or witness who is a DRPA Patrol Officer or Employee in the Division of Public Safety and who desires to appear as a participant while on duty, must submit a request to the Chief Public Safety Officer or his designee for excused/permitted time off with pay to attend any grievance hearing. Such permission shall not be unreasonably withheld. The names of the FOP representatives or witnesses shall be certified in writing to the Chief Public Safety Officer or his designee.

G.    The time and place for grievance hearings will be set by written mutual agreement. If the time set requires an FOP officer (Executive Board or grievance committee member) to attend such grievance hearings while off duty, the DRPA will pay not more than two (2) such FOP officers four (4) hours pay at their base rate of pay.

- 14 -

**H.**     Copies of all written grievances and written determinations at each phase will be forwarded to the FOP President and Grievance Committee Chairman before the expiration of the time limits within which the grievant or the FOP must move to the next phase of the grievance procedure or to arbitration. In the event that the FOP President is unavailable to be served with a copy of a written grievance or a written determination as referenced above, the DRPA shall serve the FOP President's designee provided that the FOP President has submitted a written designation naming a representative to receive such notices.

**I.**     If at any level of the formal grievance procedure no response is given by DRPA within the specified time, the grievance shall be deemed and construed as rejected or denied. However, any time limitations may be extended by written mutual consent.

**J.**     The authorized FOP representative will be permitted to utilize DRPA non-vehicular equipment, such as telephones, interoffice mail, and fax machines, to investigate a grievance. The representative shall contact the facility Lieutenant or his/her designee prior to doing so in order to make sure that it will not interrupt operations.

## ARTICLE XV
## SURVIVAL OF TERMS

If any terms of this Agreement are declared invalid by any court, such decision shall not invalidate any other provisions of this Agreement.

## ARTICLE XVI
## USE OF DRPA FACILITIES

**Section 1.**     The DRPA will provide bulletin boards at each facility for use by the FOP. The bulletin boards shall be used for posting announcements, letters of interest to the membership and information on social affairs, provided such postings are signed by an FOP officer. The bulletin boards may further be used for the display of FOP merchandise such as pins, hats, shirts, et cetera. In addition, and subject to availability, the DRPA will provide a locker or other secure space of equivalent size for the storage of FOP merchandise.

**Section 2.**     Separate bulletin boards shall be maintained by the DRPA for the purpose of posting general directives and notices. All Patrol Officers during any tour of duty shall be deemed to have read and to have become familiar with all items posted as if they have signed such notice. Copies of such bulletin board notices shall be placed in a mail box of the FOP President.

**Section 3.**     The interoffice mail system will be made available to the FOP for the use and purpose of conducting official DRPA/FOP business.

**Section 4.**     During the term of this Agreement, the DRPA will check off sums of money for the FOP Credit Union: Provided, however, that the DRPA is in no way responsible in connection with such deductions except to turn them over to a designated person.

**Section 5.**     The Police Chief or his designee will arrange for periodic meetings with authorized FOP representatives to discuss issues related to this Collective Bargaining Agreement or the terms and conditions of employment. The FOP shall also have the right to request such a meeting. If at any time an Employee requests a meeting with the Police Chief or his designee to discuss matters related to the Collective Bargaining Agreement or the terms and conditions of employment, an authorized FOP representative shall be present.

**Section 6.** The DRPA will provide a copy of this Agreement to every Employee covered by this Agreement, at no cost to the FOP. The DRPA will provide such copy within sixty (60) days from signing of this Agreement. The copy of this Agreement will be in addition to the copies of the Public Safety/Police Standard Operating Procedures, Public Safety/Police Rules and Regulations, and the DRPA Rules and Regulations provided to Employees.

## ARTICLE XVII
## MILITARY LEAVE

Employees shall follow the DRPA's existing Military Leave policy and procedures, or such policies and procedures as DRPA may institute during the term of this Agreement.

## ARTICLE XVIII
## LEAVE OF ABSENCE WITHOUT PAY

Employees shall follow DRPA's existing Leave of Absence Without Pay Policy, or such policies and procedures as DRPA may institute during the term of this Agreement. If an Employee is on leave of absence without pay, he shall not accrue any paid leave during the period of absence. The remainder of leave an Employee may be entitled to shall be prorated based upon the number of months worked in the calendar year. There shall be no loss of seniority to an Employee on a leave of absence without pay. Upon an Employee's return from a leave of absence without pay, he or she shall be returned to his or her former position/squad/shift/division. When an Employee fails to report to work at the end of his or her leave of absence, or any extension thereof, he or she may be deemed by the DRPA to have terminated his or her employment.

# ARTICLE XIX
## LIMITED DUTY STATUS

The DRPA will place non-work-related temporarily disabled Employees able to do so on light or limited duty status within the Department of Public Safety to the extent that such duty is determined to be available in DRPA's sole discretion, even if on an intermittent basis. This provision shall also apply to those Employees temporarily partially disabled due to injury on the job before they have fully recovered, if approved by a physician. The DRPA will make a reasonable attempt to place the temporarily partially-disabled Employee on the same work schedule currently assigned to that Patrol officer.

# ARTICLE XX
## WAGES AND COMPENSATION

**Section 1.    Base Wage, Retroactive Increases, and Out-Year Increases.** The Arbitration Award dated September 22, 2008 resolved the issue of Base Pay and Retroactive Pay for Patrol Officers and established the wage increases for Patrol Officers over the term of this Collective Bargaining Agreement. The terms of the Arbitration Award are set forth in Attachment C. The bargaining team acting for the Corporals and Sergeants has agreed with Management on Base Wage, wage increases, and retroactive pay for Corporals and Sergeants and these agreements are set forth in Attachment D.

**Section 2.    Pay Scale for New Hires.** Patrol officers newly hired after the effective date of this Agreement shall be paid at the tiered rates set forth as follows:

(A)    75% of the then-effective Base Wage on hiring as police officer through graduation from the Academy.

(B)    80% upon graduation from Academy to the one year anniversary of hiring.

(C)    85% to the second year anniversary of hiring.

(D)    90% to the third anniversary of hiring.

(E)    95% to the fourth anniversary of hiring.

(F)    Full Base Wage beginning at the four year anniversary of hiring.

**Section 3.    Qualified Longevity.** All Employees must pass all annual tests required to remain certified as a police officer. If an Employee passes the said tests in any contract year, the Employee will be eligible to receive a pay adjustment as an increase in Base Wage on the following basis:

(A)  On January 1st of the year in which an Employee will achieve the fifth year anniversary of the Employee's being hired as a police officer the Employee will receive a one per cent (1%) increase in his Base Wage.

(B)   On January 1st of each year in which the Employee will achieve each subsequent anniversary of hiring, the Employee will receive an additional one half of one percent (0.5%) increase in Base Wage, up to a maximum total increase of eleven percent (11%) after 25 years.

## ARTICLE XXI
## HOURS OF WORK AND OVERTIME

**Section 1.**   Pursuant to the side-letter agreement reached by the parties, Patrol Officers currently work 12-hour shifts.  The existing terms and conditions under the 12-hour shift arrangement shall continue to be governed by the side-letter agreement subject to the DRPA's right to revert to the 8-hour shift schedule as provided in the Arbitration Award of September 22, 2008.

**Section 2.**   Corporals and Sergeants currently work 12-hour shifts.  In the event that the DRPA exercise its right to revert to the 8-hour shift schedule, Corporals and Sergeants will work the same shift as that worked by Patrol Officers.

**Section 3.**   Employees shall receive lunch and relief breaks as follows subject to operational need:

**A.**   6:00 a.m. to 6:00 p.m. – fifty minute lunch period and two (2) twenty-five minute relief periods, one before lunch and one after lunch.

**B.**   6:00 p.m. to 6:00 a.m. – fifty minute lunch period and two (2) twenty-five minute relief periods, one before lunch and one after lunch.

**C.**   "Operational need" will be deemed to exist when a supervisor determines that for operational reasons including but not limited to, shortage of staff, actual or potential events, physical conditions, and level of traffic or other usage on the facility, there is a need to shorten, reschedule, defer, or eliminate any lunch or other break periods.

**Section 4.**   Overtime will be paid as provided in the side letter agreement.

**Section 5.**   Holiday pay will be calculated and paid based upon the provisions of the side letter agreement.

**Section 6.**   The 12-Hour Shift Agreement provides that all overtime will be paid and there will be no "comp time" or "computer time on the books" and this provision remains in force so long as the 12 hour shift continues to be worked at DRPA.

**Section 7.**   Effective January 1, 2000, lunch money of Eight Dollars ($8.00) shall be paid for every four (4) hours of overtime worked.

**Section 8.**     Except as otherwise agreed, the provisions of this Article shall not affect in any way the DRPA's sole right to change the schedule of hours of work and the scheduled work week, whether to avoid overtime or for any other reason.

A.     Daily and weekly overtime will not both be paid for the same hours of work. This means that any hours worked beyond eight (8) hours in a day, for which overtime is paid, will not be counted at the end of the week in computing total hours worked in the week. When two or more overtime payments might be applicable to the same hours of work, only the highest will be paid. In no case will premium payments be duplicated or pyramided.

**Section 9.**     Insofar as it is practical and consistent with efficient operation, the DRPA will endeavor to divide overtime equally among regularly scheduled qualified Employees with DRPA who regularly perform such work. There will be separate overtime lists for Patrol Officers and "Supervision" which will include Corporals and Sergeants. The regular overtime list which is maintained on computer shall be utilized to assign overtime. In the event it is necessary to force an employee to work overtime, the DRPA shall use the forced overtime list that is maintained on computer. If an Employee is excused from working overtime, he will be charged with such overtime for the sole purpose of this section. Except in cases of emergency, the DRPA will make its best effort to provide Employees with at least one (1) hour notice that overtime is required or that overtime previously scheduled is no longer required.

**Section 10.**     The weekly pay program now in existence will continue. Employees' checks will become available on a given day each week, and there shall be no distribution of checks prior to the established payday. All paychecks will be itemized showing vacation, sick, overtime and computer time, plus hours worked. All checks will be issued in sealed envelopes. All payment for all straight time hours worked and scheduled overtime shall be made by the next regular pay period. The DRPA will make its best effort to ensure that all payment for unscheduled overtime, holiday, vacation and sick time shall be made by the next regular pay period. If the DRPA is unable to make payment for unscheduled overtime, holiday, vacation and sick time by the next regular pay period, such payment shall be made by the second following regular pay period.

**Section 11.**     When operational needs warrant, an Employee may be called to work on a day off in accordance with the present overtime procedure. The regular overtime lists at each Facility shall be used in such situations. Such procedure shall be consistent with Section 9 hereinabove.

**Section 12.**     Employees shall not operate salt trucks for more than one hour per call-in or hold-over period, unless Bridge Operations Department employees cannot report to work within that time as a result of road conditions.

- 19 -

## ARTICLE XXI
## MISCELLANEOUS BENEFITS

During the period of this Agreement, the DRPA will make available the following items, including any limitations or conditions that now exist:

**Section 1.**    The present Pension Plan.

**Section 2.**    Life insurance benefits at the level of one times the individual's salary, rounded to the higher $1,000, and up to a maximum of $250,000.. Accidental death benefits in addition to the aforementioned life insurance at the level of one times the individual's salary rounded to the higher $1,000 up to a maximum of $250,000. Employees are eligible to purchase, at their own cost, Optional Life Insurance coverage during Open Enrollment in increments of $10,000 to a maximum of $300,000.

**Section 3.**    The present Tuition Program.

**Section 4.**    The allotment of passes for free bridge trips via EZ Pass that was in effect during the prior Collective Bargaining Agreement (that terminated as of December 31, 2004); specifically passes for 100 free bridge trips and 10 free PATCO trips each year.

**Section 5.**    Uniforms and rubber boots for inclement weather. Such boots shall be replaced on the basis of fair wear and tear.

**Section 6.**    Commencing on January 1, 2008 and continuing throughout the term of this Agreement, the DRPA will pay a clothing and shoe/uniform maintenance allowance of $1,200 per employee per contract year; provided that the payment for the period July 1, 2008 – December 31, 2008 will be $400 per Patrol Officer reflecting the payment of $800 received by Patrol Officers in 2008, and further provided that there will be no additional payment to Corporals and Sergeants in 2008 reflecting the fact that they received the entire $1,200 in two payments of $600 each during 2008. Subsequent installments of $600 each will be paid in January 2009 and July 2009.

**Section 7.**    Prescription eyeglass safety glasses for all Employees requiring the use of glasses, as directed by their doctor and regular safety glasses for the other.

**Section 8.**    The replacement of lost or damaged personal property at fair market value not to exceed One Hundred Dollars ($100) per item upon presentation of reasonable proof of loss or damage. The replacement cost for the item will not be the basis for reimbursement.

**Section 9.**    The DRPA shall provide on a monthly basis, to any Employee requesting same, two (2) boxes of the currently-issued firearms ammunition at fifty (50) rounds per box, paper targets, and access to a firing range to use said ammunition. The

- 20 -

requesting Employee will coordinate with the range instructor to schedule a date and time to discharge the requested ammunition.

Section 10.    Each Employee shall, on a semi-annual basis, be granted a specific appointment to review his personnel file as maintained by DRPA's Human Resources Division. Such review shall be made in the presence of an appropriate officer of the DRPA, and shall not require a loss of the requesting Employee's paid time. The personnel file subject to examination shall include the officer's employment application, performance appraisal forms, letters of commendation, record of promotions, special training or other related achievements, and reports of any disciplinary action. An Employee may request correction or expungement of information in the file where there are pertinent and substantive inaccuracies. Such request shall not be unreasonably denied when the inaccuracies can be satisfactorily documented by the Employee. No document of anonymous origin shall be maintained in an Employee's personnel file, and no complaint shall be retained in the Employee's file which has not been made a part of any discipline.

## ARTICLE XXIII
## SICK LEAVE

Section 1.    For purposes of accounting for sick leave under the existing side-letter agreement regarding 12-hour shifts, the following conditions are set forth. The hourly amounts contained herein are necessarily dependent upon the type of shift arrangement in place. Pursuant to the Arbitration Award, the DRPA reserves its right to amend these hourly amounts in conjunction with the exercise of its right to revert to the 8-hour shift arrangement. All permanent FOP represented Employees shall be entitled to sick leave at the rate of 80 hours per calendar year. During the first year of service for new Patrol Officers, sick leave time will be prorated at six and two thirds (6.67) hours per month of service. Sick leave may be accumulated up to a maximum of one thousand four hundred and forty (1440) hours, for sick leave use only. Sick leave accumulated after September 1, 1993, shall not be eligible for reimbursement upon separation. An Employee who had accumulated sick leave as of September 1, 1993 will be eligible to be paid for that accumulated sick leave up to a maximum of 1440 hours, as provided in Policy Series 130. An Employee eligible for reimbursement upon separation shall be paid a cash settlement, and will not be given the option of time or money.

Section 2.    Employees will use sick leave credited in the current year before any sick leave previously accumulated. Employees will normally accumulate all sick leave hours not used in a given year, adding these to the previous total of accumulated and unused sick leave hours (based on the applicable work day then in effect), if any, up to a maximum of two-thousand one-hundred and sixty (2160) hours.

Section 3.    No sick leave accumulated after September 1, 1993, shall be payable upon separation; however, an Employee who was employed on or before June 30th of the current calendar year who uses less than eighty (80) hours of sick leave

in a given year may elect to be paid for the difference between the number of hours used and eighty (80). For example, if the Employee uses twelve (12) hours of sick leave, he may elect to be paid for sixty eight (68) hours and accumulate the remainder of his sick leave, up to one thousand four hundred and forty (1440) hours. Payment will be based on the Employee's base salary at the time payment is made (this excludes overtime). This payment will be made in mid-December of the year in which the sick leave was credited. The request for cash payment for the eligible sick leave must be made by forwarding Form P-029 through the chain of supervision to Human Relations prior to December 1st of the current calendar year. There will be no payment for unused sick leave for Employees hired on or after July 1st of any calendar year. In the event that Management elects to revert to the eight hour shift schedule as permitted hereunder, the hours available for annual sick leave buy back will remain at eighty (80).

     **A.**    If an Employee is paid for any or all eighty (80) hours in mid-December and between that point and the end of December takes sick leave time, he will have deducted from his pay the number of hours utilized that he had already been reimbursed for.

     **B.**    For an Employee to receive payment for eighty (80) hours or less of unused sick leave in the current calendar year, he or she must be actively and continuously employed from the applicable date of eligibility through December 31st of that calendar year.

     **Section 4.**    When an Employee is ill and unable to report to work, his or her immediate supervisor should be advised of this fact on or before the normal starting time. Employees on shift work shall give notice at least one (1) hour before their scheduled starting time to permit re-arrangement of schedules. Employees shall make every effort to contact their supervisors personally to ensure delivery of the message. If the supervisor cannot be reached, the individual taking the message shall relay it to the supervisor as soon as possible. Failure to provide notice of sick leave absence in accordance with this policy may, upon review by the Employee's supervisor, be considered unauthorized absence for which the Employee will not be paid. When reporting in sick, an Employee should advise the expected date of return to work, if known.

     **Section 5.**    If an Employee is absent prior to a scheduled day(s) off and the absence will extend through the subsequent workdays, he or she must notify his or her supervisor of his or her intent to remain on sick leave after the scheduled day(s) off. If notification is not received from the Employee, it will be assumed the Employee intends to return to work after the day(s) off, and if he or she does not report for duty he or she will be charged with unauthorized absence.

     **Section 6.**    A doctor's certificate is not normally required for illness causing absence for two (2) consecutive working days or less. A certificate is normally required for illness resulting in absence of more than two (2) consecutive working days. (Note: Sick Leave absence separated by a day off or days off for any reason is considered

absence on consecutive workdays). The doctor's certificate must be presented to the Employee's supervisor upon return to work.

Section 7.    If an Employee is scheduled to work on an approved holiday and reports as absent due to illness, the absence will be charged to the holiday and not to sick leave.

Section 8.    Absence due to work-related injuries will not be charged to sick leave if the physician assigned by the DRPA indicates that the Employee is unable to work. If the physician certifies that an Employee is able to work and the Employee continues to remain absent, the absence will fall under the provisions of the sick leave policy. If subsequent abuse of sick leave policy is indicated, it is handled accordingly.

Section 9.    Employees who had previously been employed by the DRPA who terminated their employment and who subsequently were re-employed will not receive any sick leave credit for unused sick leave hours for the periods of prior service; nor will any period of this prior service be used to compute current sick leave balance.

Section 10.    During the year in which the Employee leaves DRPA service, sick leave will be credited at the rate of 6.67 hours per month, or portion thereof, up to the effective date of termination.

Section 11.    Employees who were receiving their regular pay for any reason (pay for time worked, vacation pay, sick leave pay, etc.) within thirty (30) days prior to year's end, will receive the new year's sick leave entitlement on January 1st of the new year. Employees who exhausted all leave pay entitlement prior to thirty (30) days before the end of the year will not receive the new sick leave entitlement of eighty (80) hours until they return to work on a full-time basis in the new year. As is the case throughout this Article, the calculation of hours in this Section is subject to the DRPA's right to revert to the 8-hour shift arrangement as provided in the Arbitration Award of September 22, 2008.

Section 12.    Sick leave is a valuable privilege, which should not be abused and not be confused with time off for job-connected injuries. In order to substantiate payroll records, supervisors must be assured to their satisfaction that sick leave absence is in fact due to illness. The Chief of Public Safety shall review cases of apparently excessive or unjustified sick leave and take appropriate action.

## ARTICLE XXIV
## SHORT TERM DISABILITY/LONG TERM DISABILITY

DRPA will provide a Short-Term Disability policy to be effective on the first day of the first month after this Collective Bargaining Agreement is executed by all Parties. The Short Term Disability policy will provide that after fourteen (14) days of sickness, accident, or injury (other than an injury or illness covered by workers compensation) each

Employee will be paid an amount equal to 60% of current straight-time pay based on a forty (40) hour work week and a 2080 hour work year. The DRPA will also provide a Long-Term Disability policy which, after 180 days, will provide an amount equal to 60% of current straight-time pay. Under the long-term disability policy, which may continue until the death of the disabled Employee, or until normal retirement age, whichever occurs first, the amount of current straight-time pay will be adjusted upward each year for a maximum of five (5) years by an amount not to exceed 50% of the increase in the Consumer Price Index, or by 6%, whichever is less. During the fourteen (14) day waiting period; (i) if an Employee is eligible for coverage under the DRPA Family and Medical Leave Act Policy in place at the time of the waiting period then the Employee will use such leave as may be required under the DRPA Family and Medical Leave Act policy in place at the time of the waiting period, (ii) if an Employee is not eligible for coverage under the DRPA Family and Medical Leave Act policy in connection with the illness or injury in question, then in that event the Employee must use such accumulated benefit time as the Employee may have on the books at that time.

Employees who accumulated more than thirty (30) days of sick leave, prior to January 1, 1993, and chose not to have the full accumulated amount reimbursed until separation, may in the case of accident, sickness or injury or other hardship, draw their accumulated sick leave money prior to separation before having to be covered under the Short-Term Disability program. Such draw shall be under the same terms as the foregoing January 1, 1993, one-time option.

**ARTICLE XXV**

## LIABILITY INSURANCE

The DRPA shall provide liability insurance for Employees sued as a result of the performance of their duties and will hold them harmless and indemnify them for any cost arising there from or from any criminal proceeding arising from the same occurrence in accordance with Article XIII of DRPA By-Laws. A copy of the relevant provisions is attached hereto as Exhibit "A." DRPA may self-insure such insurance coverage.

## ARTICLE XXVI

## DRUG AND ALCOHOL AWARENESS PROGRAM

Employees shall follow the procedures set forth in DRPA's Drug and Alcohol Awareness Program, including but not limited to Section IV- Implementation of the program, subsection C-Employee Reporting Responsibility, or such new policies or procedures as DRPA may develop during the term of this Agreement.

## ARTICLE XXVII
## HEALTH INSURANCE BENEFITS

Section 1.      The terms under which Patrol Officers will be covered for health benefits are set forth in the Arbitration Award of September 22, 2008. Corporals and

- 24 -

Sergeants will be covered for health benefits on the same terms set forth in the said Arbitration Award, a copy of which is attached hereto and made a part hereof as Attachment B.

**Section 2.**     In the case of an Employee who is married to another employee of the DRPA, only the more senior employee shall receive health care coverage as a DRPA employee.

**Section 3.**     The DRPA may change any provision of this Article which in its sole judgment is appropriate as a result of any law enacted which is applicable to DRPA with respect to mandatory health care for employees.

**Section 4.**     Retirees shall have the right to switch their health care coverage annually during DRPA's open enrollment period from the retiree's current plan to another plan offered by DRPA.

## ARTICLE XXVIII
## HOLIDAYS/ADMINISTRATIVE LEAVE DAYS

Employees shall be paid for eleven (11) holidays as follows:

- New Year's Day
- Lincoln's Birthday
- Washington's Birthday
- Easter Sunday
- Memorial Day
- Independence Day
- Labor Day
- Columbus Day
- Veterans Day
- Thanksgiving Day
- Christmas Day

Any Employee who so desires may elect to substitute Martin Luther King, Jr.'s Birthday for any of the above-listed holidays. In each year, Employees will be guaranteed three (3) administrative leave days for which they shall be paid; provided, however, that during the first year of service for new employees, eligibility for administrative leave days shall only occur once every four (4) months of service.

Non-shift workers will celebrate any holiday falling on Saturday the preceding Friday and any holiday falling on Sunday will be celebrated on the following Monday.

# ARTICLE XXIX
# VACATION

**Section 1.** Employees shall receive vacation with pay as follows as modified by the provisions of the 12 Hour Shift Agreement:

    A. Less than six (6) months of continuous employment - none.

    B. After six (6) full months through completion of twelve (12) months of continuous employment – 5/6 of a vacation day six and two thirds (6.67) hours for each full month worked.

    C. After completion of one (1) full year through completion of five (5) full years of employment - two weeks (eighty hours).

    D. After completion of five (5) full years through completion of fifteen (15) full years of employment - three weeks (one hundred and twenty hours).

    E. After completion of fifteen (15) years through completion of twenty-five (25) full years of employment - four weeks (one hundred and sixty hours).

    F. After completion of twenty-five (25) full years of employment - five weeks (two hundred hours).

**Section 2.** Vacation time may be used in days, subject to manpower needs. Individual days in increments of less than five (5) days are to be scheduled administratively.

**Section 3.** The selection of vacation time shall begin in February of each year and shall be granted on the basis of seniority within the unit for Patrol Officers and separately for Supervisors (Corporals and Sergeants). After each squad has completed its vacation selection, Employees in that squad shall be notified if their selection has been approved within thirty (30) days.

**Section 4.** An Employee who retires at any time after January 1st of a given year shall be entitled to a full year of vacation pay for that forthcoming year.

**Section 5.** An Employee may accrue up to thirty (30) days (two hundred and forty hours) vacation and carry over same from year to year.

**Section 6.** Upon the death of an Employee, DRPA will compensate the Employee's estate for his accumulated vacation leave.

Section 7.    If a death occurs in Employee's immediate family while the Employee is on vacation leave, bereavement leave will be used in lieu of vacation leave, subject to the limitation on number of days contained elsewhere in this Agreement.

## ARTICLE XXX
## FUNERAL LEAVE

Section 1.    All Employees shall receive four (4) workdays (full work days based upon whatever shift, 8 hour or 12 hour, is then in force) off with pay following the death of an Employee's spouse, parent, child, step-parent, stepchild, grandparent, grandchild, sister, brother, mother-in-law, father-in-law, or any relative residing in such Employee's principal residence immediately prior to death.

Section 2.    Employees shall receive one (1) workday (a full work day based upon whatever shift, 8 hour or 12 hour, is then in force) off with pay on a scheduled workday for the purpose of attending a funeral held on such workday for a son-in-law, daughter-in-law, brother-in-law, sister-in-law, uncle, aunt, cousin, niece, nephew or spouse's grandparents.

Section 3.    The bereveament leave provisions shall not be construed as a limitation or restriction on the emergency leave/attendance practices provided to Employees, but shall merely be considered a guarantee of a minimum leave in cases of death as referred to herein.

## ARTICLE XXXI
## INJURED-ON-DUTY PAY

Section 1.    For purposes of this contract term, paragraph 3 of the Arbitration Award of September 22, 2008 is hereby incorporated. As set forth therein, any Employee injured while engaged in police activities and within the scope of his/her job assignment and applicable Work Rules, shall receive, for a period of up to 26 weeks, his/her weekly pay for a regularly scheduled work week (i.e., straight time only, net of taxes). A patrol officer receiving Workers Compensation during that 26 week period is required to turn over all benefit checks to the Authority within thirty (30) days of receipt of the check. This requirement is automatic and the Authority is not required to provide notice to the patrol officer.

Section 2.    The parties have agreed that for the purposes of this Agreement that paragraph 3 of the Arbitration Award of September 22, 2008 will also be applicable to Corporals and Sergeants.

## ARTICLE XXXII
## HEALTH AND WELFARE ("H&W") FUND

**Section 1.**    DRPA will pay to the FOP Health and Welfare Fund an amount equal to seven and one half cents ($0.075) per hour paid to DRPA employees represented by FOP.

## ARTICLE XXXIII
## RIGHTS UNDER APPLICABLE LAWS

In addition to the rights contained in this Agreement, this Agreement incorporates any and all rights available under applicable federal or state laws, including but not limited to the Americans with Disabilities Act and the Family and Medical Leave Act.

## ARTICLE XXXIV
## TERM

This Agreement shall be in full force and effect from January 1, 2005, and shall remain in effect through December 31, 2009 as it relates to the Patrol Officers. **With regard to the Corporals and Sergeants, this Agreement shall be in full force and effect from July 1, 2007, and shall remain in effect through December 31, 2009. However, no provision hereof shall be deemed retroactive other than as stated herein or as stated in the Arbitration Award.**

## ARTICLE XXXV
## IMPASSE RESOLUTION PROCEDURE

**Section 1. Good Faith Negotiations.**   The Parties will meet to conduct good faith negotiations on not less than seven (7) occasions during a period of not less than three (3) months.  Negotiations may commence prior to the expiration of the then current contract between the parties.

**Section 2. Impasse Procedure.**    If, following the required amount of time and number of meetings, the Parties mutually agree that they are unable to make further advances on any matter of substance, defined to include: compensation, and matters that are a legal subject of collective bargaining in both creator states, then the Parties may elect to utilize this Impasse Resolution Procedure.  If the Parties do not agree that impasse has occurred on any one or more items, then each of the Parties shall prepare a statement explaining why it believes that impasse has or has not been reached.

**Section 3. List of Impasse Items.**   The Parties will agree on a list of items on which progress cannot be made in good faith negotiations.  If the Parties are unable to agree on a single list, they shall submit a joint list ("the Joint List") of any items on which they do agree, supplemented with separate additional lists from either or both Parties.

**Section 4. Submittal to CEO.** The Parties will then submit the Joint List and separate lists, if any, to the Chief Executive Officer ("CEO") of DRPA. The Parties shall also submit a mutual statement of the status of negotiations on each item showing the then current proposal from each Party on each issue.

**Section 5. Position Statement.** Each Party may also submit to the CEO a brief statement of its position on any one or more of the matters on the Joint List and/or separate lists, if any were submitted.

**Section 6. CEO Decision.** Within 15 business days following receipt of the Joint List and/or separate lists, if any, the CEO will respond by either (a) meeting with the parties together or separately to discuss the issues, or (b) issuing a written response suggesting a method for compromise on those issues on the list(s) where the CEO believes compromise may be productively pursued. The CEO may also elect to pursue both methods or any other method of proceeding that the CEO believes may be productive, and may also request a reasonable extension of time within which to present a report.

**Section 7. Continued Negotiations.** The Parties shall resume negotiations in good faith on all items where the CEO has suggested a possible compromise.

**Section 8. Notification of Panel.** If the CEO declines to make a compromise proposal on any one or more issues or if, following negotiations in good faith after receipt of such a proposal from the CEO, the Union or DRPA wishes to proceed with further steps, the Union, the DRPA negotiators or the Parties jointly may notify a panel, composed of the CEO of the Authority plus two Commissioners (or their delegates) selected by the Chairman and two Commissioners (or their delegates) selected by the Vice Chairman of the Authority and three FOP members named by the FOP leadership ("the Panel") that they wish to have the Panel advise the parties regarding the negotiations. Notice of such a step would be sent through the Corporate Secretary of the DRPA and would include a brief but specific statement of the items on the lists specified in Section 6 above as to which impasse is alleged to exist, and the efforts made to resolve the alleged impasse including the results of consultation with the CEO. Each Party may also provide a brief written statement of its position on any disputed issues.

**Section 9. Panel Consideration.** The Panel will have full power to consider the matters presented to it using the methods it deems most useful in resolving the issues including, but not limited to: (i) meeting with either or both parties separately or together, (ii) consultation with staff or with outside advisors.

**Section 10. Panel Findings.** After due consideration, but within 30 days following receipt of all submissions required herein or by the Panel, the Panel will advise both parties, in writing or orally, of its findings.

**Section 11. Imposition.** During the Impasse Resolution process DRPA will not unilaterally impose new terms with respect to: A. wages; B. the hourly Health & Welfare

Fund contribution; C. Overtime calculation (that is, time and one half and double time calculations). Unless an item is arbitrable in both creator states, DRPA retains the right to impose new terms except as specified above. DRPA may impose new terms as to any topic if FOP seeks binding interest arbitration.

**DELAWARE RIVER PORT AUTHORITY**

BY: _____

John J. Matheussen, Chief Executive Officer

Date: _____

**FRATERNAL ORDER OF POLICE, LODGE 30**

BY: _____

President Thomas Jeffers, Jr.

_____

Immediate Past President James Stewart

_____

SOA Chairman Richard Nelson

_____

Treasurer George Bollendorf

_____

Recording Secretary Timothy Hoagland

DATE:

Reviewed by Office of General Counsel and Approved as to Legal Form

- 30 -

2



**DELAWARE RIVER PORT AUTHORITY**
*of Pennsylvania & New Jersey*

**PATCO**
*Port Authority Transit Corporation*

**FILE**

Michael J. Conallen, Jr.
Deputy Chief Executive Officer

January 23, 2015

**RECEIVED**

JAN 2 6 2015

POLICE DEPARTMENT

Mr. Paul Williams, Sr.
320 South Third Street
Oxford PA  19363

Re:  Grievance Request for Paul Williams, Sr. – 10/9/14

Dear Mr. Williams:

I am in receipt of Grievance dated 10/9/14 for Paul Williams for his full pay while out injured and made whole for previous two weeks he has been on workers compensation.

I have reviewed this matter and all relevant facts provided and must deny this grievance at my level.  If you wish to appeal this decision, please consult your collective bargaining agreement for any rights pertaining thereto.

Yours truly,

Michael J. Conallen,
Deputy CEO of the DRPA

MJC:dw
cc: Kristen Mayock, General Counsel
    Chief Jack Stief
    Kelly Forbes, Director of HRS
    Charles Price, President of FOP Lodge #30
    File

*DRPA is an equal opportunity employer*

**Mailing Address:** PO Box 1949 Camden New Jersey 08101-1949  **Tel:** 856.968.2444  **Fax:** 856.968.2458  **E-mail:** mjconallen@drpa.org



**DELAWARE RIVER PORT AUTHORITY**
*of Pennsylvania & New Jersey*

**John L. Stief**
Chief of Police
DRPA Police Department

October 20, 2014

Charles Price
President, FOP Lodge #30
c/o Walt Whitman Bridge
**VIA INTEROFFICE MAIL**

Re:   P/O Paul Williams

Dear Mr. Price:

On Thursday, October 9, 2014, you presented a grievance on behalf of P/O Paul Williams.  In your grievance, you request that P/O Williams be granted 26 weeks at full pay rate as per the FOP Collective Bargaining Agreement.

Unfortunately, this is a medical condition that must be handled by the DRPA's Legal and Claims Administration Departments.

I am unable to resolve this grievance at my level.  Please be advised that you may prove this to the next level by forwarding this matter to Michael Conallen, Jr., Deputy Chief Executive Officer.

Very truly yours,

JOHN L. STIEF
CHIEF OF POLICE, DRPA

JLS/tl

Cc:   Michael Conallen, Jr., Deputy CEO
      Danielle McNichol, General Counsel
      Kelly Forbes, Director Human Resource Services
      File

*DRPA is an equal opportunity employer*

DELAWARE RIVER PORT AUTHORITY

GRIEVANCE REPORT

*(PLEASE PRINT OR TYPE)*

| | | | |
|---|---|---|---|
| TO | Chief Stief | FROM | FOP Lodge #30 |
| UNION | FOP Lodge #30 | DATE | 10/09/2014 |
| DEPARTMENT | Police | FACILITY | CBB |
| POSITION | Police | DATE OF INCIDENT | On-going |

FIRST LEVEL GRIEVANCE HEARING

WAS FIRST LEVEL WAIVED?     YES ☒     NO ☐

DATE HEARD _____     HEARD BY _____

### SUBJECT OF GRIEVANCE

| | | | |
|---|---|---|---|
| Pay or allowances | ☐ | Working Conditions | ☐ |
| Assignment of Work | ☐ | Discipline | ☐ |
| Application of Contract | ☐ | Discharge | ☐ |
| Interpretation of Contract | ☐ | Contract Clause (specify) | ☒ |

Article  XXXI     Section  1     Page  27

Other (please explain)

---

Officer Paul Williams was ordered to see Dr. Kahanovitz, who was selected by the DRPA to evaluate his "Intermittent FMLA" status. During Officer Williams' visit Dr. Kahanovitz determined he was no longer fit for duty and instead changed his status to limited/modified duty. Officer Williams subsequently began receiving workers compensation benefits.

Over the Past four years Officer Williams has been cleared for full duty by numerous doctors selected by the DRPA. It is the belief of the FOP that whatever Dr. Kahanovitz found during his evaluation of Officer Williams is either new or a separate injury. Therefore, Officer Williams should be entitled to a full twenty six weeks of full pay while out of work.

However, even if it is determined to be associated with his existing injury the FOP still believes given the amount of time that Officer Williams was back on full duty and that the DRPA took it upon themselves to initiate this entire process, Officer Williams should still be entitled to a full twenty six weeks of pay as spelled out in the current CBA.

The FOP requests that Officer Williams immediately be given his full pay while out injured and made whole for the previous two weeks he has been on workers compensation.

OCT 9 2014 AM 11:42

| | | |
|---|---|---|
| Matt Gorman, Treasure FOP Lodge #30 | | 10/09/14 |
| Grievant (please print) | Signature | Date |
| Charles Price, President FOP Lodge #30 | | 10/09/14 |
| Union Representative (please print) | Signature | Date |

Rev.1.0

3



**DELAWARE RIVER PORT AUTHORITY**
EMPLOYEE ACCIDENT REPORT
(ALL ACCIDENTS MUST BE REPORTED)



TODAY'S DATE January 21, 2013

(1) NAME Ptl. Paul Williams    AGE ___  SEX Male

(2) TITLE/OCCUPATION Police Officer    DEPT. Public Safety    FACILITY C.B.B.

(3) DATE OF INJURY 1-21-2013    TIME 8:24pm  A.M./P.M. DAY Monday

(4) EXACT LOCATION WHERE INJURY OCCURRED Commodore Barry Bridge, Lane #5, approx. Mid-Span

(5) WHAT WERE THE CONDITIONS AT THE ACCIDENT SITE? Snow & Icy

(6) NATURE OF INJURY (describe in detail.) Ptl. Paul Williams stated that while responding to a motor vehicle crash in Lane #5, while exiting his patrol car, he slipped on the surface of the roadway injuring his right arm.

(7) HAVE YOU HAD A PREVIOUS INJURY TO THE SAME BODY PART? ☐ YES  ☒ NO (If yes, describe.) _____

(8) WHAT FIRST AID TREATMENT WAS GIVEN (if any and by whom) None. The officer was advised to advise me of any issues

(9) DOCTOR OR HOSPITAL REQUIRED? ☐ YES  ☒ NO (If yes, who and where) _____

(10) NATURE OF WORK (at time of accident) The officer stated that while exiting his patrol vehicle, he slipped on the surface of the roadway onto his right side injuring his right arm. He stated it was sore

(11) DESCRIBE ACCIDENT IN DETAIL (use additional sheet if necessary) Same

(12) DID YOU REPORT ACCIDENT IMMEDIATELY TO YOUR SUPERVISOR? ☒ YES  ☐ NO (If not, why?) _____

(13) WHAT PERSONAL PROTECTION/SAFETY EQUIPMENT WERE YOU USING? None

(14) WITNESSES TO THE ACCIDENT (name, dept, facility) Mr. Tuscan, Driver of the vehicle involved in the crash.

ADDITIONAL COMMENTS OR INFORMATION I immediately advised my supervisor upon being informed of the injury.

EMPLOYEE SIGNATURE _____ #302    DATE 4/5/13

## TO BE COMPLETED BY SUPERVISOR

(1) DO YOU CONCUR WITH THE ABOVE FACTS AS RELATED BY EMPLOYEE? ☒ YES  ☐ NO (If no, please explain/additional comments:)

(2) COULD ANY CONDITIONS AT THE SITE BE DESCRIBED AS **HAZARDOUS?** (If so, explain) Yes. Snow & Ice roadway surface

(3) CITE SAFETY RULE VIOLATIONS OR ANY INFRACTIONS OF AUTHORITY'S RULES & INSTRUCTIONS FOR CONDUCTING OPERATIONS BY THE EMPLOYEE WHICH MAY HAVE CONTRIBUTED TO THE INCIDENT. None

(4) WAS ANY ACTION TAKEN TO PREVENT REOCCURRENCE OF INCIDENT? (If so, explain.) Yes. Salting Operations were in effect during the incident. (continued) Chr. the incident

(5) DID THIS INCIDENT INVOLVE PROPERTY DAMAGE? (If so, how extensive?) Yes Property Damage

DID EMPLOYEE LOSE TIME? ☐ YES  ☐ NO

AUTHORIZED SIGNATORY (print name) Cpl. & Asst Cadre Brown    DATE 1-31-13

AUTHORITY SIGNATURE _____ #352 / Lt. J. O'neill #105   DIVISION DIRECTOR/ CHIEF _____ .068

WHITE: Claims Administration    YELLOW: Division Director/Chief of Police

Form 362, Rev (8-09)PM    970-12718

# SCIBAL ◢ ASSOCIATES

PO Box 500 ▪ Somers Point, NJ 08244-0500        250D Corporate Court   South Plainfield, NJ  07080
   Phone: 609.653.8400 ▪ Fax: 609.926.9270         Phone:  908-222-7500 _ Fax:  908-222-2299

## FIRST REPORT OF INJURY (FROI) – FOR E-MAIL SUBMISSIONS
**Instructions for form completion and e-mailing:**
   - Save the master form with a new file name (File, Save As)
   - Use TAB key to move through answer fields
   - All information must be completed for each claim submitted
   - When finished, save file again.
   - E-mail form to: froi@sciadvantage.com

### EMPLOYER
1. Name:   Delaware River Port Authority
2. Street address:   1 Port Center, 2 Riverside Drive
3. Employer city: Camden      State: NJ           Zip:  08101

### EMPLOYEE/WAGE
1. Last name:   Williams
2. First name:  Paul
3. Middle initial: J.
4. Street address: 320 South Third Street
5. City: Oxford      State: PA        Zip:  19363
6. Home Area Code & Phone #:  (610)467-0079
7. Date of birth: 10/8/73
8. Social security #:  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
9. Date of hire: 3/20/02
10. State of hire:  NJ
11. Sex:  X male   ☐ female
12. Occupation/job title:  Police Officer
13. Department Number: 510115  Department Name:  Public Safety – CBB (DRPA)
14.   Marital status:
   ☐ Unmarried   ☐ Single/Divorced   X Married   ☐ Separated   ☐ Unknown
15. Employment status:   (Please select the FIRST status that applies to the injured worker, make only ONE selection)
   1 ☐ Piece Worker
   2 ☐ Volunteer Worker
   3 ☐ Seasonal Employee
   4 ☐ Apprentice Full-Time
   5 ☐ Apprentice Part-Time
   6 X Regular Full-Time Employee
   7 ☐ Regular Part-Time Employee
   8 ☐ Not Employed
   9 ☐ Retired
   10 ☐ On Strike
   11 ☐ Disabled
   12 ☐ Other

Page 1 of 3

# SCIBAL ⚡ ASSOCIATES

PO Box 500 ▪ Somers Point, NJ 08244-0500      250D Corporate Court   South Plainfield, NJ  07080
Phone: 609.653.8400 ▪ Fax: 609.926.9270      Phone:  908-222-7500 _ Fax: 908-222-2299

16. Wage rate:  $1,288.14  ☐per day  X per week  ☐per month
17. Days worked per week:   5
18. Full pay for day of injury:    X yes  ☐ no
19. Did salary continue?  X yes  ☐ no

## OCCURRENCE/TREATMENT
1. Time employee began work:  6:00 ☐ am  X pm
2. Date of injury or illness: 1/21/13
3. Time of occurrence:   8:24 ☐  am  X  pm
4. Last work date: NLT
5. Date employer was notified of occurrence:   1/21/13
6. Date disability began: NLT
7. Type of injury:   slip/fall (ice)
   Body Part affected:  right arm
   Did injury/illness/exposure occur on employer's premises?   X Yes  ☐ No
   Department or location where accident or illness exposure occurred:  Commodore Barry
   Bridge, Lane 5 (mid-span), Bridgeport, NJ 08014.
   ZIP Code of injury site: 08014
8. All equipment, materials or chemicals employee was using when accident or illness
   exposure occurred:  None.
9. Specific activity the employee was engaged in when the accident or illness exposure
   occurred:   Responding to motor vehicle accident.
10. Work process the employee was engaged in when accident or illness exposure occurred:
    Responding to motor vehicle accident.
11. How did injury or illness/abnormal health condition occur? Describe the sequence of events
    and include any objects or substances that directly injured the employee or made the
    employee ill:  While responding to a motor vehicle accident he slipped on the roadway and
    injured his right arm.
12. Date returned to work:  NLT
13. If fatal, give date of death:     N/A
14. Were safeguards or safety equipment provided?    X Yes   ☐ No
15. Were they used?    X  Yes   ☐ No

## MEDICAL PROVIDER
1. Name of Physician or Health Care Provider: None.
2. Address:
3. City:
4. State:
   Zip:
5. Name of Hospital or off site treatment facility:   None
6. Address:

# SCIBAL ⬛ ASSOCIATES

PO Box 500 ▪ Somers Point, NJ 08244-0500          250D Corporate Court   South Plainfield, NJ 07080
Phone: 609.653.8400 ▪ Fax: 609.926.9270          Phone:  908-222-7500 _ Fax:  908-222-2299

7.  City:              State:       Zip:

8.  Initial Treatment:        X  No Medical Treatment
                              ☐ Minor: Treatment by Employer
                              ☐ Minor: Clinic or Hospital
                              ☐ Emergency Care
                              ☐ Hospitalized greater than 24 hours
                              ☐ Future major medical/lost time anticipated

## OTHER
1. Witness name:  Mr. Tuscan (driver of the vehicle involved in the accident)
2. Witness Area Code & Phone #:
3. Date Administrator (TPA) notified:  2/6/13
4. Date Report Prepared: 2/6/13
5. Preparer's Name:     Brenda L. Greene
6. Preparer's Title:    Claims Administrator
7. Preparer's Area Code & Phone #:    856-968-2241

**Tina Leuzzi**

| | |
|---|---|
| **From:** | Tina Leuzzi |
| **Sent:** | Wednesday, February 06, 2013 2:24 PM |
| **To:** | chaynes@scibal.com |
| **Cc:** | Brenda Greene |
| **Subject:** | Paul J. Williams |
| **Attachments:** | Williams FROI 1.21.13.doc |

Enclosed please find a new worker's compensation claim for Mr. Williams.  Mr. Williams did not lose time from work and he did not seek medical treatment.  Please set up the file as usual and contact me with any questions.  Thank you.



**DELAWARE RIVER PORT AUTHORITY**
*of Pennsylvania & New Jersey*

**Tina L. Leuzzi**
Legal Assistant, Claims Administration

One Port Center
2 Riverside Dr.
P.O. Box 1949
Camden, N.J. 08101-1949
(V) 856-968-2419
(F) 856-968-2216
tlleuzzi@drpa.org

1

# REQUEST for EMPLOYEE INFORMATION

| | |
|---|---|
| Last Name, First Name, MI | WILLIAMS, PAUL J. |
| 1.  Home Address with Zip Code | 320 South Third Street<br>Oxford, PA  19363 |
| 2.  Home Phone Number | (610) 467-0079 |
| 3.  Social Security Number | 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 |
| 4.  Date of Hire | March 20, 2002 |
| 5.  Date of Birth | October 8, 1973 |
| 6.  Job Title/Description | Police Officer |
| 7.  Organization Code / Purpose | 510115 |
| 8.  Organization Title / Department | Public Safety - CBB |
| 9.  Marital Status | Married |
| 10. Gross Weekly Salary | $30.67/hour |

X 42
= 1,288.14

1/24/2013 12:00 PM [Date Submitted to Claims Administrator]

**Brenda Greene**

| | |
|---|---|
| **From:** | Brenda Greene |
| **Sent:** | Tuesday, January 22, 2013 4:59 PM |
| **To:** | George Bollendorf |
| **Cc:** | Gary K. Smith; Jack Stief |
| **Subject:** | Paul Williams, D/L 1/21/13 |



**Sensitivity:**            Confidential

I called and left a message for Mr. Williams to call me to let me know if he was injured as a result of his fall last night.   Also, were there any witnesses to his fall on ice?

In addition, I understand that he called out sick for tonights' 6pm shift.

Let me know if you hear from him.  Thanks.

P.S.  Paul just returned my call and said he just called out sick, while he fell on ice, he doesn't need a doctor, he'll be alright.  I asked him to let me know if things change and he said okay...

**DELAWARE RIVER PORT AUTHORITY**
*of Pennsylvania & New Jersey*

**Brenda L. Greene**
Claims Administrator

One Port Center
2 Riverside Dr.
P.O. Box 1949
Camden, N.J. 08101-1949
(V) 856-968-2441
(F) 856-968-2216
blgreene@drpa.org

**Brenda Greene**

| | |
|---|---|
| **From:** | Brenda Greene |
| **Sent:** | Tuesday, January 22, 2013 10:13 AM |
| **To:** | Danielle McNichol |
| **Cc:** | Lisa Murphy |
| **Subject:** | Paul Williams slipped and fell on ice last night |
| **Sensitivity:** | Confidential |

He did not want to go to doctor's for c/o pain to his right arm.  We'll see what happens after he wakes up today.  He worked 6pm-6am last night and is scheduled to RTW tonight at 6pm.  He fell at the CBB which could make this a NJ claim.  We'll see.  FYI.



**DELAWARE RIVER PORT AUTHORITY**
*of Pennsylvania & New Jersey*

**Brenda L. Greene**
Claims Administrator

One Port Center
2 Riverside Dr.
P.O. Box 1949
Camden, N.J. 08101-1949
(V) 856-968-2441
(F) 856-968-2216
blgreene@drpa.org

1

**Sandi Thompson**

| | |
|---|---|
| **From:** | Tina Leuzzi |
| **Sent:** | Thursday, January 24, 2013 7:55 AM |
| **To:** | Sandi Thompson; Tamika Espino; Kelly Forbes; Toni Brown |
| **Cc:** | Brenda Greene |
| **Subject:** | Paul Williams |

RE:  Paul Williams, D/L: 1/21/13

Please advise of the following information concerning:

1.     home address with zip code
2.     home phone number
3.     social security number
4.     date of hire
5.     date of birth
6.     job title/description
7.     Org code/Purpose
8.     Org title /Department
9.     marital status
10.    gross weekly wage.

Thank you.

 **DELAWARE RIVER PORT AUTHORITY** *of Pennsylvania & New Jersey*

Tina L. Leuzzi
Legal Assistant, Claims Administration

One Port Center
2 Riverside Dr.
P.O. Box 1949
Camden, N.J. 08101-1949
(V) 856-968-2419
(F) 856-968-2216
tlleuzzi@drpa.org

4

# CHRISTIAN I. FRAS, MD, FACS

### SPINE SURGERY

2000 Sproul Road, Suite 320   •   Broomall, PA 19008   •   484-427-8100   •   Fax: 484-427-8103

RE: PAUL WILLIAMS
DOB: 10/08/1973

APRIL 9, 2013

**HPI:** Mr. Williams returns for followup. He has been having some challenges at home and some family issues relating to his wife. He reports that he has had some kidney issues as well for which he is seeing a urologist. He continues to have low back pain and bilateral leg pain. He has a feeling of abdominal pain. He has some midback pain. He has not had any recent injections.

**PHYSICAL EXAMINATION:** Continues to show tenderness to palpation in the lower back. He has paraspinous muscle spasm in the lower back. He has full strength and normal sensation in bilateral lower extremities.

**RADIOLOGY:** X-rays of the lumbar spine dated March 20, 2013 are reviewed without accompanying radiology report. There is evidence of pseudoarthrosis at L5-S1.

**IMPRESSION:** Symptomatic lumbar pseudoarthrosis.

**PLAN:** We discussed the diagnosis and various treatment options, both surgical and nonsurgical. I suggested that he consider going to pain management to try injections before pursuing surgery, as surgery for this situation, while certainly an option, would be a rather large operation and given its revision nature would be one that has an increased risk for a complication. We had a long discussion in this regard. He will consider this. For now, he will follow up with the urologist as well as his primary care physician regarding his other medical issues. I will see him back on an as needed basis.

Christian Fras, M.D.

CF/sah

*Dictated but not read*

RECEIVED

cc:   Christopher Davis, D.O.
166 Saxer Avenue
Springfield, PA 19064

Patient Name: PAUL WILLIAMS
EMRN:    14204782
DOB:      10/08/1973
Encounter Date: 11/05/2013
PAUL WILLIAMS
320 S 3RD ST
OXFORD, PA 19363-1730
Home: (215) 901-3073

November 5, 2013

Catherine J. DiGregorio, M.D.
Crozer-Chester Medical Center
30 Medical Center Boulevard
POB I, Suite 305
Upland, PA 19013

Robert F. Sing, D.O.
166 Saxer Avenue
Springfield, PA 19063

**RE:  Paul Williams**
**DOB: 10/08/1973**

Dear Doctors:

I had the pleasure of seeing Paul Williams in neurosurgical spine evaluation and consultation.  As you know, he is a very pleasant 40-year-old gentleman who unfortunately had work-related injury on December 24, 2008.  While working as a police officer, he was around multiple car crashes and unfortunately impacted his police vehicle on black ice.  He fell when getting out of car twice and subsequently went to the hospital for treatment.  He subsequently went to workmen's comp and unfortunately failed conservative therapy, physical therapy, and injections.  He underwent an anterior and posterior fusion by Dr. Scott Rushton at Pennsylvania Hospital.  He unfortunately did not get any significant relief after surgery and feels he has actually worsened.  He notes that 50% of his pain is in his back as well as 50% in his legs.  His pain is worsened with lying supine, prone, standing, or walking.

I did review his imaging, including CT scan as well as MRI from approximately two years ago.  It shows him to have carbon fiber cage at L5-S1 interspace.  This did not appear to be in the disc space, however, in the anterior portion of the graft with

Patient Name:  PAUL WILLIAMS
EMRN:   14204762
Encounter Date: 11/06/2013

remodeling around it and does not appear to have a solid fusion.  In addition, he has an EMG from 06/2012, which shows a left S1 radiculopathy.

I did review all these findings with him and we had a long discussion on treatment options and risks of surgery.  We also discussed anterior, posterior, and combined procedures as well as possible osteotomies.  He does understand these risks and wishes to be further worked up.  We will, therefore, obtain scoliosis films of his spine as well as CT and MRI of his lumbar spine and flexion and extension films of his lumbar spine.

I thank you once again for allowing me to participate in his care.

Sincerely,


James S. Harrop, M.D., F.A.C.S.
Professor of Neurological Surgery

JSH/v2k

Electronically verified by:JAMES  HARROP MD  Nov  7 2013  2:05PM EST

Electronically signed by:JAMES  HARROP MD  Nov  7 2013  2:05PM EST

5



Professional Pain Management Associates, P.C.
215-925-0986 • 484-234-0679
PPMAPC.com

Ms. Patricia Tygielski
M E S Solutions
230 S. Broad St, Ste 501
Philadelphia, PA 19102

Date of Evaluation: 07/19/2013
Claimant: Paul William
Claim#: U74338
Date of Injury: 12/23/2008
Employer: Delaware River Port
Authority
MES File #: 21613002790
Exam Specialty: Pain Management
Jurisdiction Pennsylvania

Dear Ms. Tygielski:

Thank you for allowing me to perform an Independent Medical Examination on Mr.
Williams. I had the opportunity to take a history, perform a physical examination, and
review the patient's medical records as provided.

The process of independent medical examination was explained to the patient and no
doctor and patient relationship was established as a result of this encounter. The patient
arrived approximately one hour early.

Mr. Williams' current age is 39. His work-related injury occurring in his capacity as a
police officer for Delaware River Port Authority while responding to an accident on
December 23, 2012. His vehicle struck the ice on the road surface and he then hit the
concrete barrier. As he was trying to exit the vehicle, he fell twice on the icy surface.
When his legs came underneath him, he fell straight on his back. He was driven to
Methodist Hospital where he was treated, evaluated, and released.

Follow up with a doctor from Healthmark who referred him to Drs. Ivill and Mehallo
secondary to the spondoliethesis. MRI of the lumbar spine was performed, and the
patient was referred to Dr. Malumed from Premier Orthopedics. His treatment continued

Page 2
Paul William

with prescription medications, physical therapy, and ultimately epidural injections by Dr. Catherine DiGregorio.

He was referred for orthopedic spinal evaluation with Dr. Scott Rushton, who performed anterior posterior fixation with interbody fusion as well as a posterior instrumentation. After the surgery, he continues to have pain with mild improvement at times. He continued to follow up with Dr. Rushton since that time. At request of Dr. Rushton, Dr. Christian Fras performed a second opinion. Dr. Fras continues to follow him after the evaluation

Current treating physicians include: Dr. Christian Fras, Drs. Sirg and Davis from Springfield, PA Physicians, scheduled follow-up with Dr. Catherine DiGregorio for epidural steroid injections, although prior to surgery they provided little-to-no relief.

Mr. Williams' pain is across his lower lumbar spine equally right and left, occasionally worse on one side than the other, but overall equal. He has pain down both legs in the posterolateral and lateral aspect of the thigh, calf, and into the bottom of the foot. Pain in the calf is aching as well as throbbing. He reports at times complete control loss of motor function, which lasts less than five minutes. Pain is sharp, stabbing, and jolting. He has dysesthesias over the anterior abdominal wall where previous anterior exposure was performed.

Pain is increased with lifting, weather, or Valsalva and decreased with medications, lying in a fetal position or lounge chair. He currently is not undergoing any therapy. He does some pushups as well as modified crunches at home.

He also complains of pain in his cervical spine with radiation to the head with occasional headaches.

Past Surgical History: Remarkable for carpal tunnel bilaterally secondary to his work-related injury, kidney stones. Lumbar spine surgery as previously described.

Current Medications: Tramadol 50 mg, twice per day during the days he works, oxycodone 5 mg when he does not work, one to two up to every three to four hours, senna. Valium for sleep, spasms, as well as anxiety. Crestor as well as Linzess, which is a stool softener.

Drug Allergies: None.

Social History/ Family: Socially, he is right-handed, completed high school, served four years in the Military as a mechanic. Denies any tobacco, alcohol, or illicit drug use.

Page 3
Paul William


Physical Examination: Vital signs: blood pressure is 132/72 and pulse is 64. The patient is awake, alert, well developed, well-nourished, in mild distress.

Cranial nerves II through XII are grossly intact.

Heart: regular rate and rhythm without murmur, S3 or rub Lungs: CTA

Neurological examination: Cervical range of motion, forward bending 60, extension 45, rotation right and left is approximately 45 degrees, side bend to right and left is 30 degrees. The patient has adequate grip strength and motor strength. The patient has no pain to palpation over the cervical and thoracic spine.

Lumbar spine: well-healed midline cicatrix for light palpation. There is no pain. The patient has increase in lumbar lordosis. Abdominal wall, hypersensitivity, allodynia and dysesthesias above the superficial surgical scar. Straight leg raising is negative in the lower legs with just some mild pain in the back.
Motor strength is slightly decease in the dorsiflexion bilaterally as well as extensor hallucis longus. There is no sensory loss to light touch in the lower extremities. The patient was able to ambulate without any obvious gait disturbance.

Records available for review:
1. Independent medical examination by Dr. Ronald Greene, May 6, 2009. Opinion he reported the patient required further treatment for the injury, which he sustained. He requires carpal tunnel release and possibility of stabilization of his L5 on S1 spondylolisthesis.

2. Notes from Dr. Singh and Davis. Last one is May 30, 2013, lower extremity radicular sensation. Currently Medications are as previously listed. He has weakness, numbness, and tingling.
3. Note in March February, medications appear stable. Visits monthly.
Note in June 4, 2012, from Dr. Singh, who recommended referral for second surgical opinion. Scheduled to have an EMG.
4. Treatment summary Dr Sing, August 27, 2012.
5. Pharmacy invoices interesting that prescriptions by Stone River are twice the charges at Walgreens.
6. Records from Delancey Medical, preoperative clearance prior by Dr. Duffy.
7. Notes from Dr. Moeller, January 11, 2013. EMG/NCT chronic right L5 and left S1 radiculopathy.
8. Notes from Dr. Moeller, June 5, 2012, which shows chronic S1 radiculopathy on the left.
9. EMG by Dr. Tatarian, December 20, 2011, showed a normal EMG nerve conduction of the lower extremities. We have a

Page 4
Paul William

10. Job summary.

11. Judge's decision recognized injury: bilateral carpal tunnel, cervical disc bulge at C5-C6 with exacerbation, aggravation, cervical degenerative disc disease, joint disease, cervical strain, exaggeration of preexisting spondylolisthesis of L5-S1 as well as S1 left radiculopathy.

12. Note from Dr. Fras most recently is April 9, 2013. Impression: symptomatic lumbar pseudoarthrosis.

13. Notes from Dr. Fras, November 29, 2012, Impression is lumbar spine pseudoarthrosis. Check EMG in view of his worsened radicular symptoms; follow up primary care physician regarding his abdominal pains.

14. Notes from Dr. Fras abdominal anterior approach as the risks were quite high. He was preferred the posterior approach to involve revision or posterior spinal fusion, re-instrumentation and attempt the posterior lumbar antibody fusion.

15. Urine drug screens performed, September 20, 2005. The urine drug screens are consistent with medications prescribed as well as those that are present.

16. Independent medical examination, December 28, 2010, by Dr. Lawrence Barr stating return back to work without restrictions. It appears that he had a solid fusion.

17. Notes from Lankenau Hospital Dr. Scott Rushton.

18. MRI from Janesville, March 20, 2013, stating that the spinal stabilization device is seen anterior L5-S1, status post lumbar laminectomy, two pedicle screw at L5, S1 as well as spinous with vertical rods. There is evidence of spondylolisthesis at least 50%. There are at least grade II to grade III in addition to intervertebral disc space is narrowed previously placed intravertebral graft has slipped forward placing anterior to S1 and inferior to L5, surgical clips are present. It appears that the graft material was extruded in anterior disc space as a consequence of spondylolisthesis.

19. MRI of the thoracic spine, August 23, 2012, shows no evidence of fracture. There are moderate degenerative changes at T8-T9, T11-T12.

20. X-rays of flexion and extension, June 14, 2010, status post lumbar laminectomy stabilization L5-S1 grade I spondylolisthesis L5 anterior to S1 neutral position and with extension it appears to be increased with flexion. There are mild degenerative changes like kidney stone is present.

21. CT of the lumbar spine without contrast, which shows presence of bilateral and 9 mm anterior spondylolisthesis at L5 on S1 with large anterior space during deformity as previously discussed. The spinal spondylolisthesis are still seen with lucency. No true bony fusion is present at the aspects of lateral posterior aspects of the spinal fuse.

22. MRI, October 25, 2011, which shows postoperative changes from grade I spondylolisthesis, near complete interval resolution of signal abnormalities at L5 and S1 plates intervertebral device, bilateral foraminal narrowing secondary to anterolisthesis and facet hypertrophy are present.

23. MRI on October 25, 2011, postoperative changes. No changes from prior study of May 7, 2011, plain films with pedicle screws are present grade II to III anterior spondylolisthesis L5-S1 compared with postoperative changes anterior at the L5-S1. There is no evidence of fracture.

Page 5
Paul William

24. July 12, 2010, x-rays again pedicle, transpedicle screws and bridging rods stable spondylolisthesis.
25. CT of the lumbar spine July 14, 2010, contrast CT of the lumbar spine demonstrates bilateral pars defects spondylolisthesis, posterior effusion present. Anterior fusion at L5-S1.
26. MR angiogram shows no vascularity, no stenosis present.
27. X-ray on July 16, 2010, shows pedicle screws, lower labrum anatomies, and spondylolisthesis.
28. Notes from Dr. Rushton's office at Lankenau. Impression is status post anterior posterior fusion.
29. Operative report of Dr. Matt Kirkland shows anterior explosion at L5-S1 discectomy and fusion,
30. Operative report, May 19, 2010, discharge on May 24, 2010. Procedures, anterior lumbar antibody arthrodesis at L5-S1, placement of the anterior lumbar intervertebral biomechanical device utilizing peek cage L5-S1 posterior lumbar fusion, L5-S1 placement of posterior single segmental spinal instrumentation utilizing transarticular fixation, aspiration left iliac crest, with intraoperative evoked potentials.
31. Office notes Dr. Rushton at Lankenau on January 31, 2012. Plan was to obtain a new CT of lumbar spine and fusion has in fact occurred. We discussed the possibility of fusion exploration posteriorly on May 31, 2012. Lumbar extremity pain of nonradicular origin, possible partial fusion at L5-S1.

X-rays personally reviewed:
1. Lumbar spine, AP and lateral June 14, 2012, showing pedicle screws at L5 through sacrum. There is a grade II spondylolisthesis at L5 on S1. There is posterior fusion and an anterior interbody fixation at L5-S1, which is anterior, as well as severe disc space narrowing.
2. Extension and flexion films on same date, flexion, which shows increase in spondylolisthesis at L5 on S1 and extension, there, seems to be reduction of fusion. There is lucency between the L5-S1 disc space.
3. Images on March 20, 2013, shows increase grade III spondylolisthesis. There is still lucency between the bodies of L5-S1.

Impression: The patient suffered work-related injury on December 23, 2008, for which he had exacerbation of previous preexisting spondylolisthesis of L5-S1, lumbar strain/sprain as well as lumbar radiculopathy. He underwent anterior and posterior interbody fusion with fixation and instrumentation posterior. Mr. Williams continues to have pain after procedure with may be due to pseudoarthrosis of fusion at L5-S1 with recurrent lumbar radiculopathy of bilateral lower extremities.

Page 6
Paul William

I do not feel at this time that Mr. Williams is fully recovered from his work-related injuries. There are still concerns of incomplete fusion or pseudoarthrosis of the L5-S1 interspace, which would be inconsistent with complete recovery.

Mr. Williams has not reached maximum medical improvement, as there is concern about pseudoarthrosis of the L5-S1. I feel the patient is symptomatic from the pseudoarthrosis as related to the work-related injury on December 23, 2008. As he continues to have symptoms, which were present prior to and remain after the surgery. Initially, he had a predominant left side pain, now has bilateral pain. EMG was also consistent with bilateral complaints.

In regards to Dr. Fra's recommendation, I feel this is worthwhile for Dr. DiGregorio whom has previously performed procedures on him to try ESI. Mr. Williams had not has relief from prior procedures, although hopefully he will. It is reasonable to try ESI injections, max 3, to see if he can decrease some of his symptomatology.

Mr. Williams is currently able to perform his duties, as related to as being a police officer at the Delaware River Port Authority. I feel he can continue. Although there is a concern about pseudoarthrosis, this should be at discretion of the orthopedic spine surgeons, who continued to treat him. As Dr. Fras has not taken him out of the work force I do not feel that it is necessary at this time.

Current treatment by Dr. Singh and Davis is reasonable and necessary. These medications allow him the function during the day and perform the job that he currently is able to. Frequency of visits can remain monthly. Whether or not medications are obtained from third party (pharmacy or mail order) versus physicians' office may need to be further clarified, as there appears to be a price discrepancy.

All the above opinions have been rendered with reasonable degree of medical certainty.

If you have any questions regarding these recommendations, please feel free to contact me. Thank you for allowing me to participate in your patient's care.

Sincerely,

Gregory H. Pharo, D.O.

GHP:cbs/mp

6

CHRISTOPHER A. DAVIS, D.O.

106 RADEN AVENUE
8TH FLOOR-PHILADELPHIA PA 19096-5233
(610) 325-752 TEL.
(610) 325-4442 FAX
110 EAST STATE STREET, SUITE E
KENNETT SQUARE, PA 19344

DEA# BD7119194

NAME Doyl Williams

ADDRESS

℞

Paul Williams is a patient in
our office treating for an injury.
He was seen in our office

today 7/1/14

SUBSTITUTION PERMISSIBLE

☐ LABEL

REFILL NR  1  2  3  4  5

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED,
THE PRESCRIBER MUST HANDWRITE "BRAND NECESSARY"
OR "BRAND MEDICALLY NECESSARY" IN THE SPACE BELOW.

4DPF0905-48

Certification of Health Care Provider for
Employee's Serious Health Condition
(Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division



OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I:  For Completion by the EMPLOYER**
**INSTRUCTIONS to the EMPLOYER:**  The Family and Medical Leave Act (FMLA) provides that an employer
may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to
submit a medical certification issued by the employee's health care provider.  Please complete Section I before giving
this form to your employee.  Your response is voluntary.  While you are not required to use this form, you may not ask
the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308.
Employers must generally maintain records and documents relating to medical certifications, recertifications, or
medical histories of employees created for FMLA purposes as confidential medical records in separate files/records
from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities
Act applies.

Employer name and contact: _Delaware River Port Authority No Comp_

Employee's job title: _Police Safety_ _Police Sergeant_   Regular work schedule: _12 hr Shift_

Employee's essential job functions: _Patrol Bridge Areas, Law Enforcement_

_Schedule   3L hr Reed_
_48hr Week_

Check if job description is attached: _✓_

**SECTION II:  For Completion by the EMPLOYEE**
**INSTRUCTIONS to the EMPLOYEE:**  Please complete Section II before giving this form to your medical
provider.  The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical
certification to support a request for FMLA leave due to your own serious health condition. If requested by your
employer, your response is required to obtain or retain the benefit of FMLA protections.  29 U.S.C. §§ 2613,
2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA
request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R.
§ 825.305(b).

Your name: _Paul_                      _Williams_
First                          Middle                          Last

**SECTION III:  For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:**  Your patient has requested leave under the FMLA.
Answer, fully and completely, all applicable parts.  Several questions seek a response as to the frequency or
duration of a condition, treatment, etc.  Your answer should be your best estimate based upon your medical
knowledge, experience, and examination of the patient.  Be as specific as you can; terms such as "lifetime,"
"unknown," or "indeterminate" may not be sufficient to determine FMLA coverage.  Limit your responses to the
condition for which the employee is seeking leave.  Please be sure to sign the form on the last page.

Provider's name and business address: _Dr. Christopher Davis @ SSMC  166 Sayers Ave  Jr. field Pa. 19064_

Type of practice / Medical specialty: _Fam Med. / Sports Med_

Telephone: ( _610_  ) _328-7262_                   Fax:( _610_  ) _328-4446_

PART A:  MEDICAL FACTS        *Knee Surgery 12/23/08*
1. Approximate date condition commenced: *5/19/10  Surgery*

Probable duration of condition: *Arthritis  Pain degenate*

Mark below as applicable;
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
___ No  ✓ Yes.  If so, dates of admission:

*Arthritis, Pain degenate*

Date(s) you treated the patient for condition: *Pt Monthly Basis & Last Visit 8/1/14*

*Refer Pt to Channel,      SEE Medical Records on File*

Will the patient need to have treatment visits at least twice per year due to the condition? ___ No  ✓ Yes.

Was medication, other than over-the-counter medication, prescribed? ___ No  ✓ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___ No  ✓ Yes.  If so, state the nature of such treatments and expected duration of treatment:

*As Needed,  Physical / Aqua Therapy, Lakin 555, Neurosurgical Consults*

2. Is the medical condition pregnancy? ✓ No ___ Yes.  If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question.  If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ✓ No ___ Yes.

If so, identify the job functions the employee is unable to perform:

*Only During Flare Up Episode, Unable if in Pain*

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

_____

_____

_____

_____

_____

_____

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No __✓Yes. *Unknown*

    If so, estimate the beginning and ending dates for the period of incapacity: *Unknown Unknown*

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No __✓Yes. *Unknown/Unknown*

    If so, are the treatments or the reduced number of hours of work medically necessary?
    ___No __✓Yes.

    Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

    *Unknown*

    Estimate the part-time or reduced work schedule the employee needs, if any: *Unknown Unknown*

    _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No __✓Yes. *intermittent pain flare ups*

    Is it medically necessary for the employee to be absent from work during the flare-ups?
    ___ No __✓Yes. If so, explain:

    *This Employee is having During Flare up And*
    *pain Medication prescribed*

    Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

    Frequency          : *8-10* times per ___ week(s)  *1* month(s)      *Section Not Completed*
                                                                                     *7/1/14*
    Duration: ___ hours or *1-2* day(s) per episode

**ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.**

*See Medical Documentation on File by PS*

_____

_____

_____

_____

Page 3                                CONTINUED ON NEXT PAGE                    Form WH-380-E Revised January 2009

_Employee Statement:_        _Neck Injury_

_Intermittent Knee Needed for Knee use or Pain_

_Ergonomic Brace Can Work average Episodic Pain_

_Medication Prescribed for Neck Injury Medical_

_Follow u/s as Needed_

_[signature]_

_[signature]_
**Signature of Health Care Provider**                         Date   _7/1/14_

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years, 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

7



**D**ELAWARE **R**IVER **P**ORT **A**UTHORITY
*of Pennsylvania & New Jersey*

**P**ATCO
*Port Authority Transit Corporation*

Claims Administration

August 5, 2014


RECEIVED

SEP   2 2014

DRPA
CLAIMS ADMINISTRATION

*Certified Mail No. 7009 0080 0002 4062 4093*
**Personal & Confidential**
Officer Paul Williams
320 South Third Street
Oxford, PA  19363

RE:    **Family and Medical Leave – Request for Second Medical Opinion**

Dear Officer Williams:

We are in receipt of the Certification of Health Care Provider dated July 1, 2014, completed by Dr. Davis. We have determined that we need additional medical certification. Therefore, pursuant to the provisions of the Family and Medical Leave Act (FMLA), we have scheduled a second medical opinion on August 29, 2014, at 2:00 PM at the offices of Dr. Kahanovitz.  The pertinent information is as follows:

> Dr. Neil Kahanovitz
> Solomon Associates, Inc.
> One Bala Plaza, Suite 627
> Bala Cynwyd, PA  19004
> 610-668-1010

Please forward a copy of any medical records which relate to your FMLA condition to Dr. Kahanovitz' office at least 10 business days prior to the date of the appointment (see appointment confirmation letter enclosed).

The Authority will pay for the doctor's examination and your reasonable transportation expenses in getting to and from the doctor's offices.  If you are unable to attend the appointment on August 29, 2014, you must advise me immediately upon receipt of this letter.

If Dr. Kahanovitz confirms the conclusions of your health care provider, your FMLA leave will be granted. If Dr. Kahanovitz does not confirm that you have a serious health condition, a third and binding opinion will be sought from a health care provider which we will select by mutual agreement.

Until it is determined that your Certification of Health Care Provider establishes an entitlement to FMLA leave and pending a decision on that second or third medical opinion, we will provisionally approve your request for Family and Medical Leave.  However, be advised that if the medical review process results in a final determination that you are not entitled to FMLA, then the provisional approval will be revoked and your absences will be treated as chargeable under the Authority's attendance policy.

Please also understand that it is a condition of your employment to cooperate in the medical review process.

*DRPA is an equal opportunity employer*

Officer Paul Williams
August 5, 2014

Page Two

If you have any questions, please do not hesitate to contact me at 856-968-2234, or via email at l_camp@drpa.org.

Very truly yours,

Leila Camp
Claims Administrator

c:   Chief J. Stief, Public Safety
      D. McNichol, General Counsel
      Lt. J. O'Neill, Public Safety, CBB
      B. L. Greene, Claims Administrator

Encs.   Confirmation letter
         Location Map

8

**NEIL KAHANOVITZ, M.D.**
ONE BALA PLAZA - SUITE 627
BALA CYNWYD, PA 19004-1499
PHONE:   (610) 668-1010

BOARD CERTIFIED
ORTHOPAEDIC SPINE SURGERY

FAX:   (610) 668-9410

August 29, 2014

RECEIVED

SEP 1 7 2014

DRPA CLAIMS ADMINISTRATION

Leila Camp
Delaware River Port Authority
Claims Administration Department
P.O. Box 1949
Camden, NJ  08101-1949

RE:      PAUL WILLIAMS
DOI:     12/23/2008

Dear Ms. Camp:

I had the opportunity to evaluate Paul Williams for a Second Medical Opinion on August 29, 2014.  The purpose of the examination was explained, as well as the fact that no doctor/patient relationship would be established.  With that understood, the examination proceeded.

**HISTORY:**

Paul Williams was injured on December 23, 2008, while working as a police officer for the Delaware River Port Authority.  He was driving a vehicle that became out of control after sliding on ice, at which time he hit a guardrail.  He states he was then briefly knocked unconscious.  He attempted to get out of the car, but also fell down twice while emerging from the car.  He had the onset of pain into the low back with subsequent radiation down both lower extremities.

He ultimately failed to respond to conservative management and underwent an anterior/posterior L5-S1 fusion in 2010.  Following the fusion he notes the pain has not improved and over the last several years has increased in intensity.  It radiates into the buttocks bilaterally into the posterior thighs, calves, to the feet, with associated numbness and tingling.  He notes that he was able to return to work approximately seven months following the surgery but has continued to lose time for pain in the above distribution, which is increasing.

RE:   PAUL J. WILLIAMS, SR.
AUGUST 29, 2014
PAGE -2-

There has been some discussion of the possibility of revision of the fusion, but at this
time no definitive treatment is planned.  He has had no injections over the last several
years and has not been having any treatment other than medication, which includes on
a daily basis oxycodone, diazepam, Senna and tramadol.  Earlier today he took the
oxycodone.  He notes that the pain is constant but made worse with increased activities.
He denies any prior history of back or radicular symptoms before the incident.

PHYSICAL EXAMINATION:

Physical examination reveals a well-developed male.  On standing, normal thoracic
kyphosis and normal lumbar lordosis.  There is a healed midline incision extending from
L3 to the sacrum.  There is minimal pain to palpation in the midline at approximately L4-
5-S1.  There is similar mild pain over the adjacent bilateral paraspinal muscles.  No
spasm or asymmetry is noted.  Extension to 10 degrees elicits pain at the lumbosacral
junction only; forward flexion to the mid thigh, similar symptoms slightly increased.
Manual motor testing of the lower extremities is normal.  Sensation to light touch is
normal throughout both lower extremities, except for slight decrease in a scattered
distribution in the left and right feet but not dermatomal in nature.  Negative straight leg
raising, Bowstring and Lasègue, except referred back pain at 70 degrees bilaterally.
Deep tendon reflexes were +2 for knee jerks, +1 ankle jerks.  No clonus was elicited.

PERTINENT DIAGNOSTIC STUDIES AVAILABLE FOR REVIEW:

1)   MRI of January 2, 2009, shows significant degenerative disease and a Grade I
     L5-S1 spondylolisthesis.

2)   X-ray of January 13, 2010, which reveals an isthmic spondylolisthesis at L5-S1.

3)   X-ray of May 17, 2011, which shows postoperative instrumentation with pedicle
     screw instrumentation and an anterior intervertebral device.  The slip appears to
     have increased to a Grade II over the preoperative status.  X-ray of June 14,
     2012, shows similar findings.

4)   A CT scan of October 25, 2011, shows the pedicle screw instrumentation intact;
     however, there does appear to be migration anterior of the interbody device.
     There is no evidence of fusion anteriorly.  Similar findings are noted on the May
     16, 2012 CT scan and November 8, CT scan, and flexion and extension shows
     approximately 3-4 mm of motion on flexion and extension; however, there does
     not appear to be any breakage of the screws.  The implant is unchanged in its
     anterior migration and there does not appear to be any fusion anteriorly noted.

RE:   PAUL J. WILLIAMS, SR.
AUGUST 29, 2014
PAGE -3-

5)   MRI of December 3, 2013, is difficult to interpret because of radiographic distortion of the instrumentation.

6)   An x-ray of June 2, 2014, does not show any significant change, but also notes significant evidence of fusion.

REVIEW OF MEDICAL RECORDS:

1.   First ROI

2.   Stipulation of Fact

3.   Job Description for Police Officer, Combined Use of Force Training

4.   Studies:
     10/25/11 -- Lumbar Spine MRI
     10/25/11 -- Lumbar Spine CT
     05/16/12 -- Lumbar Spine CT
     05/16/12 -- Lumbar Spine MRI
     06/14/12 -- Lumbosacral Spine X-ray
     06/15/12 -- EMG/NCS
     01/11/13 -- EMG/NCS
     07/19/13 -- Lumbosacral Spine X-ray
     11/08/13 -- Lumbar Spine X-ray
     11/11/13 -- Lumbar Spine CT
     11/20/13 -- Thoracic/Lumbar Spine X-ray
     12/03/13 -- Lumbar Spine MRI

5.   Ronald Greene, M.D. -- 5/6/09

6.   Lankenau Center for Spinal Disorders/Scott Rushton, M.D. -- 5/24/10
     Operative Report thru 2/15/12

7.   Christian Fras, M.D. -- 6/7/12 thru 4/30/14

8.   Comprehensive Pain Center at Crozer -- 8/13/13

9.   Christopher Davis, D.O. -- FMLA Certification 7/1/14

10.  Office Note -- 7/15/14

RE:   PAUL J. WILLIAMS, SR.
AUGUST 29, 2014
PAGE -4-

11.   ATI Physical Therapy – 3/5/14 thru 5/20/14

**DISCUSSION:**

At this time it appears that he had a poor result from the surgical procedure and, in fact, does have a pseudoarthrosis particularly anteriorly with migration of the device and no radiographic evidence of fusion.  There is also evidence of possible motion at the L5-S1 level; however, there is no breakage of the pedicle screw instrumentation.

At this time it would be my recommendation to go forward with the family medical leave. It is very possible that he may ultimately need to have additional surgery, which would be repair of the L5-S1 pseudoarthrosis.  At this time, if, in fact, he is able to work at all, it should be on a less frequent basis.  He clearly has not reached maximum medical improvement, as the need for surgery may be indicated as above.

He may pursue all activities other than those that involve repetitive bedding and lifting greater than 15# as well as any activity that may result in provocations.

All of the above comments have been made within a reasonable degree of medical certainty.  Should you have any further questions regarding this Claimant please do not hesitate to contact me.

Sincerely yours,

Neil Kahanovitz, M.D.

NH:snd

9



**DELAWARE RIVER PORT AUTHORITY**
*of Pennsylvania & New Jersey*

**PATCO**
*Port Authority Transit Corporation*

Claims Administration

**2 Riverside Drive**
**Camden NJ**

November 18, 2014

**Personal & Confidential**
Mr. Paul Williams
320 South Third Street
Oxford, PA  19363

RE:     **Family and Medical Leave – Exhaustion of Leave**

Dear Mr. Williams:

On September 17, 2014, you were sent a letter by this office renewing your application for Family and Medical Leave for the period July 1, 2014, through July 1, 2015

You are entitled under the FMLA for up to 12 weeks (or 504 hours) of leave calculated as a "rolling" 12-month period measured backward from the date of any FMLA leave usage.  During the past 12 months the following has been designated as FMLA on your behalf:

| | |
|---|---|
| Mar., 2014: | 23, 31 (12 hours each; total 24 hours) |
| Apr., 2014: | 23, 24 (12 hours each; total 24 hours) |
| May, 2014: | 2, 3, 4, 7, 8, 16, 17, 18, 21, 22, 26, 27, 30, 31 (12 hours each; total 168 hours) |
| June, 2014: | 1, 4, 5, 15, 29, (12 hours each; total 60 hours) |
| July, 2014: | 11, 12, 13 (12 hours each; total 36 hours) |
| Aug., 2014: | 10, 14, 28 (12 hours each; total 36 hours) |
| Sept., 2014: | 5, 7, 11, 15, 19, 20, 21, 24, 25, 29, 30 (12 hours each; total 132 hours) |
| Oct., 2014: | 3, 4 (12 hours each; total 24 hours) |
| **Total** | **504 hours** |

You have been absent under Worker's Compensation as of September 19, 2014.  Work-related injuries, by their nature are considered FMLA qualifying.  Therefore, your allotment of FMLA leave time ran concurrently with your workers' compensation leave beginning on the first day of your absence.  During a period of workers' compensation leave, your health benefits will be maintained under the same conditions as if you continued to work.  Your obligation to pay your share of the health insurance premiums continues while you are on workers' compensation.  While you are out, DRPA will pay your share of the health insurance premiums, but will recover those premium payments when you return to work through payroll deductions.

**Please be advised you have exhausted all available FML time as of October 4, 2014.  Your absences subsequent to that date are not FML eligible.  You will again become eligible for FMLA hours after March 23, 2015, and after you have worked at least 1,250 hours preceding the leave.**

*DRPA is an equal opportunity employer*

Mailing Address: PO Box 1949 Camden New Jersey 08101-1949  **Telephone:** 856.968.2000  **Fax:** 856.968.2216

Mr. Paul Williams                                                                                 Page 2
November 18, 2014

Upon your return to work and until you are again eligible for FMLA leave, any further absences
will be subjected to the Authority policy regarding use of sick time and excessive absenteeism.
Pursuant to the Authority Policy, you are required to provide your supervisor with the proper
notification and documentation in the event of any future absence.

For your information, enclosed is a notice informing you of your rights under the Family and
Medical Leave Act.  If you have any questions relating to your FMLA employer designated
benefits, do not hesitate to contact me at 856-968-2234.  Thank you.

Sincerely,

Leila Camp
Claims Administrator

c:   Chief J. Stief, Public Safety
     B. L. Greene, Claims Administrator